TRAVELERS INSURANCE COMPANY

v.

The CENTRAL NATIONAL
INSURANCE COMPANY
OF OMAHA.

Civ. No. H–88–442(AHN).

United States District Court,
D. Connecticut.

March 9, 1990.

As Corrected March 21, 1990.

Daniel J. Cohen and John M. Nonna, Werner, Kennedy & French, New York City, for plaintiff.

Rhonda M. Wexler, Lissa J. Paris and Francis J. Brady, Murtha, Cullina, Richter and Pinney, Hartford, Conn., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEVAS, District Judge.

This matter was tried to the court between January 30 and February 2, 1990. Pursuant to Rule 52(a), Fed.R.Civ.P., the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Travelers Insurance Company ("Travelers") is a corporation duly organized and existing under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

2. The Central National Insurance Company of Omaha ("Central National") is a corporation duly organized and existing under the laws of the State of Nebraska. During the time period relevant to the allegations in the complaint, it was licensed to do business, and did do business, in the State of Connecticut.

### The Falls Claim

3. Travelers issued to Fleming Company, Inc. ("Fleming") a liability insurance policy, effective from July 1, 1982 to July 1, 1983, bearing policy no. TREE–SLG–104T377–8–82 (the "Fleming Policy").

4. Central National issued to Travelers a casualty facultative reinsurance certificate no. ZAC–184–61–89 (the "Fleming Reinsurance Certificate").

5. Pursuant to the Fleming Reinsurance Certificate and subject to certain conditions therein, Central National agreed to indemnify Travelers up to ninety percent, or $900,000, of Travelers' insurance liability under the terms of the Fleming Policy, in excess of $100,000, plus Central National's proportion of certain expenses incurred by Travelers. In the language of the reinsurance industry, Travelers' "retention" was $100,000 and Central National's "retention" was $900,000.

6. The Fleming Reinsurance Certificate provided that Central National indemnify Travelers:

with respect to its insurance liability assumed under the policy set forth in the

front of this Certificate subject to the following terms and conditions:

D. NOTICE OF OCCURRENCE. Prompt notice shall be given [Central National] by [Travelers] of any occurrence or accident which appears likely to involve loss under the reinsurance, whether [Travelers] considers it has an adequate defense or not.

E. DEFENSE OF CLAIMS OR SUITS. While [Central National] does not undertake to investigate or defend claims or suits, it shall nevertheless have the right to be given the opportunity to associate with [Travelers] and its representatives at its own expense in the defense and control of any claim, suit or proceeding involving this reinsurance, with full cooperation of [Travelers].

7. The Fleming Reinsurance Certificate (in Paragraph F, "Loss Payable") provided as follows: "All claims involving this reinsurance, when settled by the Company [i.e., Travelers] shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlement promptly following receipt of proof of loss in the following manner...."

8. Travelers customarily sets reserves on a claim made against its insured by considering the insured's potential liability and the damages suffered by the claimant.

9. It is the custom and practice in the insurance industry that primary insurers set only minimal reserves where they believe the potential liability of their insured to be slight, even where a claimant has suffered severe injuries.

10. Travelers customarily issues precautionary notice of a claim to a reinsurer, or a reinsurer's intermediary if one is present, when the total reserves posted for that claim equal or exceed fifty percent of Travelers' retention under the reinsurance certificate.

11. Thereafter, Travelers will issue interim notices reporting on the status of the claim and the level of reserves it has set.

12. It is the custom and practice in the reinsurance industry that reinsurers do not investigate claims made against their ceding company's insured. Rather, they rely on the ceding company to do so.

13. It was Central National's practice not to be associated with or participate in the management of claims or in the setting of reserves until after claims files were transferred to Central National's attention by its broker/intermediary.

14. On February 9, 1983, Donald B. Falls was severely injured on the Fleming premises when a breaker panel he was working on exploded.

15. Falls, then age 26, received second and third degree burns over 75 percent of his body.

16. Travelers first received notice of Falls' injury on or about May 5, 1983.

17. In September 1983 Travelers learned that Falls had initiated suit against Fleming and various other defendants (the "Falls claim").

18. On May 25, 1983, Travelers' claim department personnel visited the Fleming premises to investigate the Falls claim. They learned that Fleming's workers compensation carrier had spent more than $100,000 on Falls's injuries, and that Falls continued to be hospitalized.

19. On or about June 2, 1983 Travelers posted a $25,000 claim reserve and a $15,000 expense reserve for the Falls claim.

20. Travelers set the reserve at this level because it believed that Fleming would not be subject to liability. Travelers based this belief on the thorough and complete on-site investigation of the Fleming premises by a senior claims supervisor from its Houston office.

21. Until May 1986 Travelers maintained its belief that Fleming probably would not be held liable.

22. By letter dated July 29, 1983, the attorney retained by Travelers to represent Fleming notified Travelers of "the potential for some exposure on the basis of unsafe premises" on the part of Fleming. The attorney stated that the unsafe condition had been created by the installer of the breaker panel and advised Travelers that it could expect to be indemnified by said installer. He further advised Travelers that

there was a "good cause of action against the manufacturer of the panel."

23. In May 1986 Travelers learned for the first time that Fleming employees had worked on the breaker panel after its installation.

24. Based on this information, in or about July 1986, Travelers increased its expense reserve to $50,000. It left the $25,000 claim reserve unchanged.

25. In or about August 1986, Travelers increased its claim reserves from $25,000 to $750,000.

26. Transco Insurance Services ("Transco") acted as Central National's agent for the purpose of assuming the risks under the Fleming Reinsurance Certificate. Transco also had authority to settle claims for Central National until August 1988.

27. Travelers sent notice of the Falls claim on July 12, 1986 to RFC Intermediaries, which acted as Travelers' reinsurance intermediary.

28. Central National received notices of the Falls claim dated October 22, 1986, January 28, 1987, April 27, 1987 and June 3, 1987.

29. Central National first received notice of the Falls claim through its agent Transco in November 1986.

30. Central National did not seek to participate in or be associated with the defense of the Falls claim from the time it first received notice in November 1986 until the settlement of the claim in May 1987.

31. On March 2, 1987 Transco received a memorandum dated November 11, 1986 from Jerry M. Sorrick, senior claims supervisor in Travelers' Houston claims office, regarding the Falls claim. The memorandum set forth the nature of the injuries to Falls and stated that Travelers' claim reserve was $750,000.

32. On May 28, 1987, the Falls claim was settled. Travelers paid $1,000,000 to Falls on behalf of Fleming.

33. On or about February 8, 1988, Transco received Travelers' claim file on the Falls claim.

34. Central National denied coverage under the Fleming Reinsurance Certificate, based on late notice, by letter dated May 20, 1988.

35. Central National ceded all of its retention on the Fleming Certificate ($900,000) to the following reinsurers (or "retrocessionaires"): Mentor (20%); Walton (15%); Reinsurance Company of America ("RCA") (30%); United Americas (5%); and others (30%). Central National makes no claim of prejudice regarding the "others."

36. Because these retrocessionaires reinsured Central National's portion of the retention, their policies could not be implicated until Central National's own reinsurance of Travelers was implicated.

37. In or about 1985, Mentor became insolvent.

38. Mentor posted its last letter of credit in 1984.

39. Prior to July 1986, United Americas stopped paying its claims.

40. United Americas is not insolvent.

41. Walton is not insolvent.

42. Walton last increased its letter of credit in April 1987. The total amount of the letter of credit posted by Walton as of April 23, 1987 was $4,312,646. The last increase occurred on April 23, 1987 in the amount of $1,183,449.

43. Central National has not attempted to draw down on the Walton letter of credit.

44. In the Spring of 1988, Central National and RCA entered into a commutation agreement which was made effective as of February 1, 1988.

45. The agreement was based on loss reserves maintained by Central National on December 31, 1986. As of December 31, 1986 Transco had set reserves on the Falls claim of $640,000.

46. Central National's share of liability on the Falls claim is $810,000.

47. Travelers paid $155,224 in expenses for investigating and defending the Falls claim, of which Central National's share under the Fleming Reinsurance Certificate is $125,731.44.

48. If Travelers had reported the Falls claim to Central National, through Transco, prior to July 1986, it would have reported a claim reserve of $25,000 and an expense reserve of $15,000.

49. It was not Central National's or Transco's practice to increase its reserves beyond those set by a ceding company. Transco, on Central National's behalf, generally accepted a ceding company's reserves without question.

50. Travelers seeks to recover damages from Central National on the Falls claim in the amount of $935,731.44. It also seeks to recover $164,054 in interest.

### Maleki Claim

51. Travelers issued to Peoples Drug Stores, Inc. ("Peoples Drug") a workers compensation policy, effective from October 1, 1982 to October 1, 1983 (the "Peoples Drug Policy").

52. Central National issued to Travelers a workers compensation facultative Reinsurance Certificate No. ZAW–184–49–13 (the "Peoples Drug Reinsurance Certificate").

53. Transco acted as Central National's agent for the purpose of assuming the risk under the Peoples Drug Reinsurance Certificate.

54. At some point in time Travelers paid the premium for the Peoples Drug Reinsurance Certificate.

55. The Peoples Drug Reinsurance Certificate provided that Central National would reinsure Travelers:

subject to the terms, conditions, and limit(s) of liability set forth herein ... as follows:

C. [Travelers] shall notify the [Central National] promptly of any occurrence which in [Travelers] estimate of the value of injuries or damages sought, without regard to liability, might result in judgment in an amount sufficient to involve this certificate of reinsurance. [Travelers] shall also notify [Central National] promptly of any occurrence in respect of which [Travelers] has created a loss reserve equal to or greater than fifty (50) percent of [Travelers'] retention.... While [Central National] does not undertake to investigate or defend claims or suits, it shall nevertheless have the right and shall be given the opportunity, with the full cooperation of [Travelers] to associate counsel at its own expense and to join with [Travelers] and its representatives in the defense and control of any claim, suit or proceeding involving this certificate of reinsurance.

56. Under the Peoples Drug Reinsurance Certificate Travelers' retention was $250,000.

57. On October 13, 1982, an employee of Peoples Drug, Jamshid Maleki, was severely injured in the course of his employment.

58. Mr. Maleki asserted a claim under the Peoples Drug Policy ("the Maleki claim").

59. The Maleki claim was covered by the Peoples Drug Policy.

60. Travelers conducted a full investigation of Mr. Maleki's injuries and monitored his medical condition closely.

61. Travelers made several payments to Maleki in accordance with statutory workers compensation requirements. The workers compensation law of the District of Columbia, where Mr. Maleki worked, does not permit the settlement of expense claims. Rather, the employee must be reimbursed for medical expenses as they arise in accordance with statutory standards detailing the benefits to which an injured employee is entitled.

62. Mr. Maleki sued his employer's landlord, alleging negligence, and settled the claim for $300,000. Travelers agreed to waive a lien on the sum permitted by statute in exchange for Maleki's agreement to waive future disability claims against Travelers. Travelers remained obligated to pay Maleki's medical expenses on an ongoing basis.

63. On January 31, 1983, Travelers posted reserves for the Maleki claim totalling $141,298.

64. On March 5, 1984 Travelers posted reserves for the Maleki claim totalling $1,105,641.

65. In or about January 1985 Central National first received notice of the Maleki claim.

66. Central National did not seek to participate in or be associated with the defense or investigation of the Maleki claim after it received notice in January 1985.

67. On January 18, 1985 Transco sent an inquiry to Travelers concerning the Maleki claim.

68. In February 1985 Travelers sent a letter in response to Transco's inquiry which explained the nature of the Maleki claim and the basis for the reserves Travelers had set.

69. After receiving Travelers' response Transco did not seek to participate in or be associated with the defense or investigation of the Maleki claim.

70. Beginning in 1982, Independence Intermediaries, Inc. ("Independence") acted on Travelers' behalf in obtaining reinsurance with respect to Travelers' liability under the workers compensation and employees' liability coverage in the Peoples Drug Policy.

71. On June 11, 1987, Travelers submitted information regarding the Maleki claim, including medical data, to Central National through Independence.

72. Claim payments to Mr. Maleki did not exceed Travelers' $250,000 retention on the Peoples Drug Reinsurance Certificate until June 1987.

73. Travelers submitted billings for the Maleki claim to Central National, through Independence, on June 12, 1987, July 8, 1987, August 3, 1987, August 26, 1987, September 23, 1987, December 23, 1987, March 18, 1988, and May 10, 1988.

74. Travelers demanded payment for Central National's portion of the Maleki claim by letters dated May 6, 1988 and June 6, 1988. Those letters were sent directly to Central National.

75. Central National has refused to indemnify Travelers for its losses under the Peoples Drug Policy, but, prior to this litigation, never declined coverage for late notice or any other reason.

76. Central National had no criticism of Travelers' handling of the Maleki claim.

77. Central National's share of claim payments to Mr. Maleki amounts to $71,157.69.

### Central National's Counterclaim

78. Independence was not Travelers' agent for purposes of obtaining reinsurance on the Peoples Drug Policy, but rather served as a broker/intermediary to seek and obtain reinsurance coverage in the reinsurance market place when requested to do so by Travelers.

79. In or about September 1982 Independence requested Travelers to authorize it to bind coverage.

80. Travelers gave Central National permission to bind reinsurance coverage for the Peoples Drug Policy in late September 1982.

81. Travelers believed that the Peoples Drug Reinsurance Certificate was bound in September 1982.

82. After October 1, 1982 Independence and Transco had a dispute as to whether reinsurance coverage for the Peoples Drug Policy had in fact been bound. Travelers was not aware of this dispute.

83. In or about August or September 1983, Independence requested that Central National retroactively bind coverage beginning October 1, 1982 in exchange for the immediate payment of the premium.

84. In or about August 1983, Transco requested a summary of losses under the Peoples Drug Policy known as a "loss run" for October 1, 1982 to October 1, 1983.

85. On September 1, 1983 Carl Bach of Independent wrote to Travelers requesting the loss run. In his letter Mr. Bach made no mention of a dispute with Transco and/or Central National concerning whether coverage had been bound.

86. On or about December 1, 1983, Independence provided Transco with Travel-

ers' loss run, summarizing losses under the Peoples Drug Policy as of July 31, 1983.

87. The July 31, 1983 loss run was the most recent loss run Travelers, through Independence, provided to Transco.

88. The loss run that Travelers provided through Independence stated that "no losses [are] reported as of July 31, 1983 x/s [excess] of $100,000."

89. As of July 1, 1983, Travelers had posted reserves of $141,298 with respect to the Maleki claim.

90. As of July 31, 1983, Travelers had paid out $89,800.94 on the Maleki claim.

91. Travelers did not make any representations regarding the Maleki claim or the reserve on the Maleki claim to Central National or Transco.

92. The Peoples Drug Reinsurance Certificate bears an issue date of March 13, 1984.

93. Independence paid the premium on the Peoples Drug Reinsurance Certificate (less its commission) to Central National through Transco in 1983.

94. Central National has not tendered the premium back to Travelers on the Peoples Drug Reinsurance Certificate.

95. Central National first claimed that its issuance of the Peoples Drug Reinsurance Certificate was obtained through misrepresentation in April 1989.

96. Travelers seeks to recover damages from Central National on the Maleki claim in the amount of $71,157.69. It also seeks to recover interest of $9,209. on the Maleki claim.

*Conclusions of Law*

1. The parties agree that Connecticut law controls this action.

2. If a reinsured party fails to give timely notice of a claim to its reinsurer, the reinsurer is only excused from making payment on that claim (assuming it is otherwise payable) if that reinsurer has been prejudiced as a result of the untimely notice. *Aetna Casualty and Surety Co. v. Murphy,* 206 Conn. 409, 419, 538 A.2d 219, 223 (1988). The reinsured party bears the burden of proving that the reinsurer suffered *no* such prejudice. *Id.*

■ 3. The notice provision of the Fleming Reinsurance Certificate is ambiguous. In particular, the phrase "likely to involve reinsurance" is unclear as to whether the "likelihood of involvement" is to be measured by the nature of the claim or the reserves posted by Travelers. If the latter, it is unclear at what dollar figure or percentage of retention "likelihood" is reached. This ambiguity must be construed against Central National which drafted the Fleming Reinsurance Certificate. *Sturman v. Socha,* 191 Conn. 1, 9, 463 A.2d 527, 532 (1983).

4. The ambiguity of the notice provision also permits the court to consider extrinsic evidence as an aid to interpreting the policy and ascertaining the intentions of the parties. *Marcus v. Marcus,* 175 Conn. 138, 141, 394 A.2d 727, 729 (1978).

5. Among the extrinsic evidence which may be considered is that concerning the particular purpose of the notice provision. *Lar–Rob Bus. Corp. v. Town of Fairfield,* 170 Conn. 397, 407, 365 A.2d 1086, 1092 (1976).

■ 6. Travelers presented unrebutted testimony that primary insurers, including Travelers, generally set their reserves based both on the severity of the claimant's injury and the potential liability of their insureds. The potential for liability is the more important factor. There was unrebutted testimony that primary insurers, including Travelers, will often set minimal reserves where an injury is quite .severe but liability remote. This is done in the belief that despite the likelihood of a large recovery, other defendants will bear the brunt of any verdict or settlement. Because the level of reserves represents an insurer's best estimate of the maximum liability its insured could incur, the severity of a claimant's injury has no necessary relation to the level of reserves set by a primary insurer.

7. The court takes this industry practice as the context in which the Fleming notice provision was drafted. The court con-

cludes that whether a claim is "likely to involve reinsurance" depends upon whether Travelers' reserves are set at a particular level and not on the nature of the claimant's injury.

8. Travelers presented unrebutted expert testimony that the custom and practice in the reinsurance industry is for a ceding company to give notice to its reinsurer when the ceding company's reserves equal or exceed fifty percent (50%) of its retention.

9. Travelers contends that the Fleming Reinsurance Certificate does not modify this practice. Central National asserts that the Certificate required Travelers to give notice immediately upon learning that its insured had been sued (in September 1983). At that point Travelers had posted a $25,000 claim reserve and a $15,000 expense reserve.[1]

10. Reading the notice provision in light of the purpose it was intended to serve, and construing all ambiguities against Central National, Travelers' interpretation is the more reasonable. Both parties agree that the notice provision was intended to give Central National sufficient time to participate in the investigation and defense of a claim should it choose to do so. *Aetna Casualty & Surety Co.*, 206 Conn. at 417, 538 A.2d at 222. " '([t]he purpose of a policy provision requiring the insured to give the company prompt notice of an accident or claim is to give the insurer an opportunity to make a timely adequate investigation of all the circumstances' ") (quoting 8 J. Appleman, *Insurance Law & Practice* (Rev.Ed.1981) Section 4731 at 2). Central National, however, had no field offices or personnel to conduct investigations or to monitor the work of defense counsel. There was no evidence that after it received notice of the Falls claim Central National retained an investigator or an at-

torney. In fact, there is no evidence that between the time Central National first received notice of the Falls claim in November 1986 until the claim was settled on May 28, 1987 that it did *anything* to participate in or monitor Travelers' defense. This inaction was consistent with Central National's practice, as testified to by Patricia Swanson, not to participate in the defense or investigation of claims until a claim file is transferred to its attention by Transco.[2]

11. From these facts the court concludes that Central National did not intend to participate in the handling of claims made on the Fleming policy. Since the facilitating of such participation was the sole purpose of the notice provision, the court concludes that Central National did not expect or intend to receive notice at the outset of the claim. Accordingly, the court concludes that the Fleming Reinsurance Certificate can reasonably be interpreted to reflect industry practice and require notice when Travelers' reserves reached 50% of its retention.

12. The court's interpretation of "likely to involve reinsurance" is also informed by the use of the word "likely" in the law of evidence. Courts have frequently described the standard of proof "by a preponderance of the evidence" as meaning that the truth of a particular fact is shown to be "more *likely* than not." In turn, this standard has been described in numerical terms as "more than 50+%." *United States v. Fatico*, 458 F.Supp. 388, 404 (E.D.N.Y. 1978) (Weinstein, J.), *aff'd*, 603 F.2d 1053 (2d Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). Applying such a numerical designation to the word "likely" in this context, if a claim *does* involve reinsurance when reserves equal 100% of Travelers' retention, then a claim is "*likely*" to involve reinsurance where Travelers' reserves equal 50+ per-

---

1. Central National also argued at trial that Travelers should have posted a higher initial reserve but did not do so because its investigation of the Falls claim was inadequate. This argument is not made anywhere in Central National's pleadings and thus cannot be considered by the court. In any event, the court finds that Travelers' investigation was thorough and complete and

that the initial reserves were reasonable given the results of that investigation.

2. The court gives no credence to John Bower's testimony that had Central National received early notice it would have pursued an investigation, found that Fleming's liability was imminent and set substantial reserves of its own.

cent of its retention. This coincides with the industry practice detailed above. While this comparison is not precise, it is sufficiently useful to confirm the court's direct interpretation of the notice provision.

13. Under this interpretation, Travelers did not violate the Fleming Reinsurance Certificate when it sent notice to Central National, through its agent Transco, in July 1986. Prior to this date Travelers' expense and claim reserves had totalled $40,000. Notice was sent after the expense reserve was raised to $50,000 in July 1986, thus bringing the total reserve to $75,000. While Central National did not receive the July notice, Travelers' only obligation under the Certificate was to send the notice out.

14. Moreover, Central National did receive a notice dated October 22, 1986 in November 1986. Even if the court were to find this to be the operative notice (using its receipt in November 1986 as the trigger date), the four month delay between the time Travelers raised its reserves and Central National's receipt of the notice would not excuse Central National's failure to pay absent a showing that it was prejudiced. *Aetna*, 206 Conn. at 216, 419, 538 A.2d at 222. Travelers bore the burden of proving lack of prejudice, *id.*, and the court finds that it has met that burden.

15. Central National's first claim of prejudice is that it did not have a meaningful opportunity to investigate or defend the Falls claim. But as discussed above, Central National as a rule did not involve itself in a ceding company's handling of claims. It had neither the facilities nor personnel to do so. Most probative of this question is Central National's failure to take any action whatsoever when it received notice in November 1986. The court finds that the time between this first receipt of notice and the settlement of the Falls claim in May 1987 constituted ample opportunity for participation with Travelers. Since Central National chose *not* to participate when given a chance to do so, it cannot now claim that it was prejudiced by not being given that chance earlier.

16. Central National's second claim of prejudice involves its ability to obtain payment from various retrocessionaires. This position is without merit even if the Fleming Certificate is read, as Central National contends, to require notice in May 1983. Had Central National received notice of the Falls claim at that time, it would have been notified of a $25,000 claim reserve and a $15,000 expense reserve. As noted above, Central National makes no claim in its pleadings that these reserve levels were too low or otherwise improper. Patricia Swanson testified that Transco generally *adopted* a ceding company's reserves without question. Thus, their adequacy is accepted by the court. These initial reserve figures were well below the threshold of Central National's retention, the boundary demarcating its indemnity obligation to Travelers. Indeed, Central National had no obligation to indemnify Travelers until Travelers actually settled the Falls claim or had a judgment rendered against its insured. Similarly, Central National's arrangements with its retrocessionaires were contracts of indemnity. The retrocessionaires had no obligation to make payment as long as Central National itself had not made any payments to Travelers. At a minimum, therefore, the Falls claim would have been of no concern to the retrocessionaries until Central National's reserves (which were set by Transco in full reliance on Travelers' reserves) crossed the $100,000 threshold. Thus, Central National could not have made any arrangements with the retrocessionaries to plan for payment of the Falls claim until August 1986 when Travelers increased its expense reserve from $50,000 to $750,000. There could not have been any prejudice resulting from Travelers' failure to give notice prior to this date.

17. As for the period between August and November 1986 (when Central National first received notice of the Falls claim), Travelers has met its burden of proving that Central National suffered no prejudice during this period.

18. Mentor posted its last letter of credit in 1984 and became insolvent in 1985. Since the court has held that Central Na-

tional could not have obtained additional security for the Falls claim prior to August 1986, Mentor was already insolvent by the time Central National could have first made a legitimate proposal to increase its letter of credit. Central National could not have obtained additional security from Mentor for the Falls claim had it received notice in August 1986.

19. Walton last increased its letter of credit to Central National in April 1987. Since Central National received notice of the Falls claim in November 1986, it had six months to incorporate the reserves set by Transco into that letter. Walton was not then and is not now insolvent. Central National cannot claim that it was prejudiced when it neither attempted to increase the letter to account for the Falls claim nor to draw down on the existing letter after the Falls claim was settled in May 1987. Any shortfall in regard to Walton is entirely of Central National's own making.

20. In regard to RCA, Central National decided unilaterally to use Transco's December 31, 1986 reserves as the basis for negotiating the commutation agreement. As of that date Transco had posted a reserve of $640,000, which represented Central National's portion of Travelers' reserves. Since Central National had received notice of the Falls claim in November 1986, it was fully aware of its details and could competently judge the adequacy of Travelers' reserve levels. Had it chosen to do so, Central National could have ordered Transco to set higher reserves and used those figures as the basis for the agreement with RCA. It appears that Central National's real argument is with the level of Travelers' reserves, which it claims should have been posted at the full extent of its retention: $900,000. Yet, as noted, Central National makes no claim in its pleadings concerning Travelers' setting of the reserve. Accordingly, no prejudice in regard to RCA can be proven.

21. Finally, in regard to United Americas, there was no evidence showing that Central National is unable to collect on this policy. In January 1986 United Americas posted a letter of credit for $2,235,674. An amendment in March 1986 made the letter applicable to all losses under all policies issued by United Americas to Central National. In July 1986, United Americas stopped making payments on its letters of credit, although it was not and is not insolvent. Thereafter, Central National commenced an arbitration proceeding against United Americas and prevailed on the issue of liability; only the amount of damages is yet to be determined. Thus, Central National has both a contractual right to indemnity from United Americas and an arbitration judgment enforcing that right. While it has not yet collected monies from United Americas, Travelers has met its burden of proving that Central National is not precluded from collecting in the future.

22. Accordingly, the court concludes that Travelers has met its burden under *Aetna Casualty & Surety Co. v. Murphy* of proving a lack of prejudice in regard to notice of the Falls claim. Since late notice was the only defense Central National presented at trial, the court holds that Central National is in breach of its contractual obligation to indemnify Travelers. Central National has not disputed Travelers' claim for $935,731.44 in compensatory damages and $164,054 in interest.

23. Central National presented no evidence at trial concerning the prejudicial effect of the notice it received on the Maleki claim. Central National first received notice in January 1985. It was not until June 1987 that Travelers' payments to Mr. Maleki exceeded its retention under the Peoples Drug Reinsurance Certificate— $250,000. During this almost two and one-half year period, Central National made no attempt to be associated with Travelers' investigation or assessment of the claim. Indeed, Central National has no criticism of Travelers' handling of the claim. Therefore, to the extent Central National claims that it was prejudiced by late notice of the Maleki claim, Travelers has carried its burden of proving that no such prejudice occurred.

24. Central National's counterclaim alleges that Travelers negligently misrepresented the existence of the Maleki

claim. The counterclaim arises out of Transco's refusal to bind coverage for the Peoples Drug Reinsurance Certificate when initially requested to do so by Independence in September 1982. Central National alleges that when it sought retroactive coverage in August 1983, Travelers provided it with a "loss run" which showed that as of July 31, 1983 no claims over $100,000 had been asserted against Peoples Drug. Because Travelers had posted reserves on the Maleki claim of $141,298 as of July 1, 1988, Central National claims that the loss run misrepresented the risk Central National was insuring.

25. Connecticut follows the Restatement (Second) of Torts' formulation of negligent misrepresentation. *See D'Ulisse–Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 217–18, 520 A.2d 217, 223 (1987). Section 552 of the Restatement provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability of pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) *through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.*

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

(emphasis added).

26. At trial, Central National failed to prove either that Travelers intended the loss run to influence its decision to bind coverage or that Travelers knew it would in fact influence its decision to bind. Travelers believed in September 1982 that Independence had bound coverage on its behalf. There was no evidence that Travelers was aware of the subsequent dispute between Independence and Transco as to whether coverage had in fact been bound. The September 1, 1983 letter from Carl Bach of Independence to Travelers, requesting a copy of the loss run, stated that it was for the internal use of Independence. No mention was made of either Transco or Central National. Given Travelers' ignorance of these matters, it could not have intended that Central National rely on the loss run in deciding whether to bind coverage retroactively. It also had no knowledge that Central National did in fact rely on the loss run (assuming this was the case). Because Independence was Travelers' intermediary/broker, not agent, Independence's knowledge of the dispute cannot be imputed to Travelers.

27. In the absence of this crucial element, Central National cannot prevail on its counterclaim.

28. Travelers has complied with all its contractual obligations under both reinsurance certificates.

*Conclusion*

For the foregoing reasons, pursuant to Rule 58, Fed.R.Civ.P., judgment shall hereby enter in favor of plaintiff Travelers in the amount of $1,180,153.29.

SO ORDERED.