UNITED TECHNOLOGIES CORP., Carrier Corporation, and United Technologies Automotive, Inc., Plaintiffs,

v.

AMERICAN HOME ASSURANCE COMPANY, Defendant.

No. 292 cv 00267 (JBA).

United States District Court, D. Connecticut.

March 31, 1997.

Bernard Green, Green & Gross, Bridgeport, CT, Special Master.

David B. Zabel, Stewart I. Edelstein, Marci J. Silverman, Stuart M. Katz, Cohen & Wolf, P.C., Bridgeport, CT, Kay M. Brady, Stephen M. Goldman, Carolyn M. Branthoover, Thomas J. Smith, Patrick J. McElhinny, Robert Bruce Allensworth, David F. McGonigle, Keith A. Fabi, Michael G. Zanic, Evan A. Bloch, David T. Fisfis, Diane B. Hopper, Terry Budd, C. Michele Kirk, Peter J. Kalis, David R. Cohen, Mary Beth Collery, thomas M. Reiter, John P. Englert, Michael S. Nelson, Alan W. Tamarelli, Richard W. Hosking, Kirkpatrick & Lockhart, Pittsburgh, PA, for Plaintiffs.

Robert W. Allen, Noble Francis Allen, Tyler, Cooper & Alcorn, New Haven, CT, David A. Silva, Bruce R. Kaliner, Wayne R. Glaubinger, Stuart Cotton, Daniel Markewich, John Mezzacappa, Mitchell S. Cohen, Diana E. Goldberg, Sarah D. Strum, Aaron F. Fishbein, Hilary M. Henkind, Mound, Cotton & Wollan, New York City, for Defendant.

## RULING ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### (Doc Nos. 499, 505)

ARTERTON, District Judge.

## I. INTRODUCTION

This environmental insurance coverage action is brought by United Technologies Corporation and its subsidiaries, plaintiffs Carrier Corporation and United Technologies Automotive (collectively, "UTC") against its insurer, American Home Assurance Company ("AH") for breach of contract, breach of the Connecticut Unfair Insurance Practices Act, and breach of the common law duties of good faith and fair dealing. The action is based on AH's failure to provide insurance coverage to UTC for contamination of the soil, groundwater and surface water at eight properties[1]. In addition, UTC seeks a declaratory judgment as to coverage at 32 other sites.

The parties are generally in agreement regarding the applicable policy provisions, however, they disagree on many policy interpretation issues. UTC filed a partial motion

---

[1]. The eight UTC facilities that are the subject of the Complaint are as follows: (1) City of Industry, California; (2) Windsor Locks, Connecticut; (3) North Haven, Connecticut; (4) Stratford, Connecticut; (5) Zanesville, Ohio; (6) Collierville, Tennessee; (7) Springfield, Massachusetts; and (8) West Palm Beach, Florida. Pursuant to the Stipulated Discovery Scheduling Order entered on July 14, 1992, discovery has been limited to the Windsor Locks site and the City of Industry site.

for summary judgment on several of these policy interpretation issues. AH filed a motion for summary judgment on several defenses and policy interpretation issues.

## II. BACKGROUND

UTC designs and manufactures high technology products throughout the world. As a result of its manufacturing operations and hazardous waste disposal practices, the soil, groundwater and/or surface water at several of UTC's plant sites, including City of Industry, California ("COI"), and Windsor Locks, Connecticut ("WL"), have been contaminated.

AH issued three consecutive all-risk property insurance policies to UTC, covering the period from November 17, 1975 to November 1, 1986 (collectively, the "Policies"). The Policies provide coverage for UTC property world-wide. UTC purchased the Policies through its broker, Johnson & Higgins ("J & H"). J & H has offices in Connecticut ("J & H CT") and New York ("J & H NY").

In its First Amended Complaint, UTC alleges that, in accordance with the Policies, AH must compensate UTC for the soil, groundwater and surface water contamination at WL and the groundwater and soil contamination at COI. Specifically, UTC alleges AH breached the Policies by failing to reimburse UTC for the expenses incurred while investigating, remediating and monitoring the contamination. UTC alleges that AH's failure to pay UTC's claim is a breach of contract. Further, UTC contends that AH's claims handling conduct and refusal to pay the claims constituted a breach of the duties of good faith and fair dealing, and violated the Connecticut Unfair Insurance Practices Act ("CUIPA").

### A. Windsor Locks

Since the 1950s, UTC has designed and manufactured air and spacecraft control systems at WL. In addition, UTC operated an industrial waste treatment plan at WL from 1953 through 1992. As a result of long term hazardous waste disposal practices and manufacturing operations, the soil, groundwater and surface water at WL have been contaminated by chromium, volatile organic com-

pounds ("VOCs") and polychlorinated biphenyls ("PCBs").

The contamination was the result of a variety of practices and operations in several locations throughout the WL property. Some of the sources of the contamination include:

1. From 1953 to 1970, chromium leaked from a concrete, underground storage tank. In August, 1970, the leak was discovered and the tank was repaired;

2. From 1975 to 1982, chromium and VOCs were released when UTC began consolidating all of the drums used to store hazardous material. During this time, the storage drums were accidentally dropped, knocked over, and punctured by forklifts;

3. Beginning in the 1950s, chromium and VOCs were released from drums which were stored outside for future use or removal by scrap metal dealers;

4. From the early 1950s through 1968, VOCs and PCBs were released when UTC allowed part of the WL property to be used for fire training exercises which involved the controlled burning of waste oils, solvents and fuels;

5. From the 1950s through the 1970s, VOCs and PCBs were released as a result of UTC's handling and disposal practices, including the disposal of waste solvents and metal hydroxide sludge by burial or direct release into sandy soil or a natural ravine;

6. From the 1950s through the 1960s, repeated pump seal failures caused PCBs to be released into the soil.

Despite these hazardous practices, UTC claims it was unaware that its land was contaminated until October, 1979, when a tornado struck Windsor Locks, Connecticut. Soon thereafter, residents located south of the WL property complained of problems with their water. Consequently, from May through August 1980, the town of Windsor and the Connecticut Department of Health collected samples from residential wells and discovered that several of the wells were contaminated with VOCs. Prompted by this discovery, the Connecticut Department of Environmental Protection ("CTDEP") issued order num-

ber 2925, dated November 4, 1980, requiring UTC to (i) investigate the extent and nature of the groundwater contamination; (ii) provide treatment and/or removal of contaminated groundwater and soil; and (iii) investigate and implement any improvements to chemical storage and handling areas.

As a result of this investigation, UTC discovered chromium and VOC contamination migrating from its property to the south. In compliance with Order No. 2925, UTC attempted to remediate the contamination by removing 127 buried drums and the soil surrounding the drums. In addition, UTC installed test wells to evaluate onsite sources of contamination.

After further investigation, the CTDEP issued two additional clean up orders. Order No. HM–160 dated May 14, 1984, required UTC to close its hazardous waste surface impoundments and implement a groundwater monitoring program. Order No. HM–170 dated May 31, 1984, required UTC to (i) investigate the extent and degree of contamination resulting from the disposal of hazardous waste at an inactive landfill sludge disposal area; and (ii) prepare a comprehensive hydrogeologic and engineering report explaining the extent and degree of contamination resulting from the landfill and identifying remedial measures necessary to control the contamination.

On April, 11, 1986, UTC gave its liability insurer, Liberty Mutual, written notice of a potential claim at WL. However, UTC admitted in an earlier proceeding that Liberty Mutual received actual notice of the CTDEP orders no later than July 27, 1982, during an environmental audit of the WL site. *See* Plaintiff's Pretrial Statement, *United Technologies Corp. v. Liberty Mutual Ins. Co.*, No. 87–7172 (Mass.Super.Ct. August 3, 1993).

On August 8, 1986, UTC entered into Consent Order No. 4402 with the CTDEP. Pursuant to this Order, UTC was required to investigate the extent of groundwater and surface water contamination and provide treatment, containment and/or removal of contaminated groundwater and soil as necessary to eliminate or minimize existing groundwater contamination.

UTC gave AH notice of the loss and damage at the WL site, at the earliest, on December 24, 1987, when it served AH with a complaint naming it and numerous other insurance companies as defendants. *United Technologies Corp. v. Liberty Mutual Insurance Co.*, No. 87–7172 (Mass.Sup.Ct.1987).[2]

On August 18, 1989, the United States Environmental Protection Agency ("EPA") executed a Consent Agreement and Order RCRA 1076. In accordance with this order, UTC agreed to evaluate the nature and extent of the hazardous waste releases at WL and to conduct a corrective measures study. As a result of these investigations, UTC has taken remedial action at WL, including the preparation of numerous site assessment reports, work plans, testing and analysis of the contaminated property and excavation and disposal of contaminated soil and building materials.

### B. *City of Industry*

UTC manufactured air conditioning and heating products at the COI facility from 1979 to 1992. The principal substance at issue in plaintiff's insurance coverage claim at COI is perchloroethylene (PCE).[3] PCE is a degreasing agent utilized by UTC in its manufacturing process to degrease and clean metal parts. Between November 1984 and April 1985, PCE spilled from a degreaser into a below-ground sump located beneath the degreaser system. On or about April 24, 1985, UTC discovered that corrosion-caused holes in the sump had allowed the PCE to discharge into the soil and groundwater.

UTC notified its liability insurer, Liberty Mutual, of the loss on May 17, 1985. On March 7, 1986, the California Regional Water Quality Control Board issued Cleanup and Abatement Order No. 86–1, which required UTC to "clean up and abate the effects of

---

**2.** This action was dismissed without prejudice on October 24, 1988, for failure to comply with the Policies' presuit procedures.

**3.** Also included in plaintiff's claim are any substances that intermingled with PCE in the degreaser, as well as substances that resulted from the chemical breakdown of PCE.

PCE discharge to soil and groundwater." In accordance with this order, UTC prepared site assessment reports, work plans, groundwater and soil testing and removed the sump. UTC provided AH with notice of the contamination at the COI site at earliest, on July 20, 1987, when UTC sent AH a letter about a potential loss.

## III. STANDARD FOR SUMMARY JUDGMENT MOTIONS

In a motion for summary judgment, the moving party must initially demonstrate that there are no material facts in dispute and "[a]ll reasonable inferences and any ambiguities are drawn in favor of the non-moving party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Once the moving party has met its burden, "the non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir. 1995); *Celotex Corp. v. Catrett,* 477 U.S. 317, 332, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986). If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper. *Finley v. Giacobbe,* 79 F.3d 1285, 1291 (2d Cir. 1996). However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## IV. CHOICE OF LAW

A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Mentor Ins. Co., Ltd. v. Brannkasse,* 996 F.2d 506, 513 (2d Cir.1993). Accordingly, Connecticut choice of law princi-

ples must be applied to this case. *See Economu v. Borg–Warner Corp.,* 652 F.Supp. 1242, 1246 (D.Conn.1987).

### A. *Choice of Law for the Breach of Contract Claim*

■ When analyzing a contractual choice of law issue, Connecticut courts have traditionally applied the doctrine of *lex loci contractus. See, e.g., Whitfield v. Empire Mut. Ins. Co.,* 167 Conn. 499, 506, 356 A.2d 139 (1975). Under this doctrine, "the validity and the construction of a contract are determined by the law of the place where the contract was made. But, if the contract is to have its operative effect or place of performance in a jurisdiction other than the place where it was entered into ... the law of the place of operative effect or performance governs its validity and construction." *Id.* at 505–06, 356 A.2d 139.

Recently, however, some Connecticut superior courts have applied the "significant relationship test" advanced in the Restatement (Second) Conflicts of Law to determine the appropriate substantive law to be applied to a contract dispute. *See e.g. Carrier Corp. v. Home Ins. Co.,* 43 Conn.Supp. 182, 648 A.2d 665 (1994); *Reichold Chemical, Inc. v. Hartford Accident and Indemnity Co.,* Superior Court, Judicial District of Hartford–New Britain at Hartford, Docket No. 351982 (February 24, 1993).

In light of these superior court decisions, Connecticut federal judges have opined that where the *lex loci* doctrine would produce an arbitrary or irrational result the Supreme Court of Connecticut would apply the Second Restatement in a contract context. *See Brandewiede v. Emery Worldwide,* 815 F.Supp. 60, 63–64 (D.Conn.1992).

■ Under *lex loci contractus,* the Court must determine where the Policies were made. *Whitfield,* 167 Conn. at 505–06, 356 A.2d 139. The undisputed facts show that the Policies were made in Connecticut. Under Connecticut law, a contract is deemed to have been made where the last act is done which is necessary to create an effective agreement between the parties. *See Chemical Trading, Inc. v. Manufacture de Pro-*

*duits Chimiques de Tournan,* 870 F.Supp. 21 (D.Conn.1994); *Electric Regulator Corp. v. Sterling Extruder Corp.,* 280 F.Supp. 550, 555 (D.Conn.1968) (citing authority). Here, the last act necessary to complete the Policies occurred in Connecticut when AH's signing agent for the state of Connecticut countersigned the Policies on behalf of AH.

 Accordingly, under the *lex loci* doctrine, Connecticut law will apply unless the Policies were performed or had their operative effect elsewhere. *Brandewiede,* 815 F.Supp. at 63; *Whitfield,* 167 Conn. at 505–06, 356 A.2d 139. The payment of premiums is a significant act of performance. *Teleco Oilfield Services, Inc. v. Skandia Ins. Co., Ltd.,* 656 F.Supp. 753, 759–60 (D.Conn.1987) (Zampano, J.). In *Teleco,* the district court found that the premiums were paid in Connecticut because the plaintiff mailed its premiums from Connecticut to a Scandinavian broker. Here, it is undisputed that premium checks were sent in the following manner: UTC sent payment to J & H CT who forwarded the payment to J & H N.Y. who remitted the payment to AH in New York. Thus, in accordance with *Teleco,* premiums were paid in Connecticut when UTC mailed its premium check to J & H CT.

Under Connecticut law, another relevant contact for purposes of determining the place of performance occurs when the insured receives payment for a claim. *See Teleco,* 656 F.Supp. at 759–60; *see also Reichold,* slip op. at 8. The *Teleco* court found that claims were paid in Connecticut because the insurance company sent any payments to the insured in Connecticut. 656 F.Supp. at 759–60. It is undisputed that claim payments were made in the following manner: AH sent payment to J & H N.Y. who forwarded it to J & H CT who then forwarded it to UTC in Connecticut. Thus, in accordance with *Teleco,* the claims were paid in Connecticut because UTC received payment in Connecticut.

The Policies had their "operative effect" at UTC's property worldwide. Here, UTC is challenging AH's insurance coverage at more than forty locations in thirteen states. New York has only one site in UTC's claim. Connecticut, with eight sites named in the complaint, is tied with New Jersey for the state with the most sites.

Application of Connecticut law will not produce an arbitrary or irrational result warranting a deviation from the *lex loci* approach. Plaintiff's headquarters are in Connecticut, communication from AH went, although somewhat indirectly, to Connecticut, and communications to AH came from Connecticut. The Policies required UTC to give notice of a loss under the Policies to J & H's Connecticut office. Moreover, it is clear from the face of the Policies, which display UTC's Connecticut address, that AH could reasonably have anticipated application of Connecticut law. *Brandewiede v. Emery Worldwide,* 815 F.Supp. at 64.

 AH claims that application of Connecticut law will frustrate the parties' expectation that New York law would apply. As evidence of this expectation, AH notes that the Policies contain a provision referring to New York law to establish the time period for bringing a suit. However, AH fails to present this Court with any authority to support its proposition that a reference to state law for purposes of establishing the period in which to bring an action constitutes a choice of law provision. *See Carrier Corp. v. Home Ins. Co.,* 43 Conn.Supp. 182, 189, 648 A.2d 665 (1994); *Sonoco Bldgs. Inc. v. American Home Assur. Co.,* 877 F.2d 1350, 1352 (7th Cir.1989).

### B. *Choice of Law for Tort Claims*

In addition to its contract action, UTC's complaint alleges that AH violated CUIPA and breached the common law obligation of good faith and fair dealing. These tort actions derive from UTC's allegation that AH engaged in unfair claims handling practices. The parties agree that Connecticut law applies the "significant relationship test" advanced in the Restatement (Second) to choice of law issues in tort actions. *See e.g. O'Connor v. O'Connor,* 201 Conn. 632, 648, 519 A.2d 13 (1986). AH argues that application of this test will reveal New York law applies, while UTC argues that it will reveal Connecticut law governs.

Under the significant relationship test, the applicable law is that of the state with the "most significant relationship to the occurrence and the parties under the principles stated in § 6." *See* Restatement (Second) Conflicts of Law, § 145. The contacts relevant to the "significant relationship test" are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* In addition, the court may consider the policies outlined in § 6 of the Restatement.[4]

■ AH argues that New York law should apply because the conduct causing the injury, the "claims handling," occurred in New York. The Court finds this argument unpersuasive because AH has failed to contradict the evidence UTC produced indicating that the claims handling for UTC's environmental claims occurred in New Jersey. AH also argues that one of the factors listed in § 6 favors New York law because it will provide "certainty, predictability or uniformity of result." However, AH fails to support this argument with any legal or factual authority. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510.

Neither criteria (c) the place of business of the parties, nor (d) the place where the relationship between the parties is centered, are helpful to the Court's analysis. Factor (c) is not determinative because the parties' principal places of business are located in Connecticut, Michigan, and New York. Factor (d) is not determinative because the relationship between the parties is centered in New York and Connecticut.

The first contact relevant under the significant relationship test, place of injury, supports application of Connecticut law because UTC received notice of the status of its claims in Connecticut. In addition, one of

the factors listed in § 6, ease in determining the applicable law, favors application of Connecticut law because it is the law of the forum. *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 12, (1st Cir.1994).

Accordingly, the Court will apply Connecticut law to the contract and tort claims.

## V. DISCUSSION

### A. *Summary of Holding*

With respect to UTC's motion for summary judgment, the Court concludes:

(1) In accordance with the *lex loci contractus* doctrine, Connecticut law applies to the contract claims because the Policies were made in Connecticut and were performed in Connecticut. Further, application of Connecticut law will not produce an arbitrary or irrational result.

The tort claims will also be governed by Connecticut law because it is the state with the "most significant relationship to the occurrence and the parties" as provided under the Restatement (Second) Conflicts of Laws.

(2) Contamination is a covered peril under the "all risk" property Policies because it was not specifically excluded.

(3) Because UTC sustained a pecuniary loss as a result of the contamination of the soil and water at WL and COI, UTC has an insurable interest in such property.

(4) The plain meaning of the term "real property" within the meaning of the Policies includes soil and water.

(5) There was physical loss and damage to the WL and COI property. However, the determination as to whether all of the damages claimed by UTC involve damage to UTC's own property or that of third parties is a disputed issue properly resolved at trial.

(6) AH does not dispute that the loss at COI occurred during the policy in effect from 1981–1986. Under the multiple inju-

---

4. Under § 6, the following factors are relevant: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.

ry in fact trigger, a material dispute exists as to whether the losses at WL occurred during the Policies.

(7) UTC is not entitled to judgment as a matter of law on its CUIPA claims because there is a dispute of material fact regarding whether AH's "general business practice" violated CUIPA.

(8) UTC's motion for summary judgment on its claim of bad faith is denied because there is a dispute regarding whether AH's alleged failure to fulfill its contractual obligation under the Policies was the result of AH's conduct or UTC's failure to cooperate with AH's investigation.

With respect to AH's motion for summary judgment, the Court concludes:

(1) UTC's notice to AH of the claims at WL and COI was untimely as a matter of law. However, there is a genuine dispute as to whether UTC can rebut the presumption of prejudice to AH.

(2) The groundwater at COI is not covered under the Policies because its transient nature is inconsistent with the purpose of property insurance policies, which only cover damage to the insured's own property.

(3) Because there is a dispute of fact as to whether UTC knew its operating practices were likely to result in hazardous soil and water contamination, the determination of whether the losses were fortuitous is properly resolved at trial.

(4) The loss in progress doctrine does not preclude coverage unless the insured was aware of a loss when it applied for the insurance. UTC's subjective knowledge at the time it applied for the Policies is a disputed issue of material fact.

(5) The contamination at COI and the chromium damage at WL are "ensuing losses" and therefore are not excluded under the Policies' exclusion for damage caused by ordinary wear and tear or gradual deterioration.

Alternatively, summary judgment is inappropriate because there is a genuine dispute as to whether the chromium damage at WL was the result of "gradual" deterioration or if it happened rather quickly.

There is also a dispute as to whether the loss at COI were the result of "ordinary wear and tear" or a design defect.

(6) In the absence of a clear statute of limitations provision, the New York six year limitation for contract actions applies. Whether the action for WL was brought within six years is disputed and is properly resolved at trial.

### B. *Untimely Notice.*

█ In its motion for summary judgment, AH argues that there is no genuine dispute that UTC failed to give AH timely notice of the claims at WL and COI, a condition precedent to coverage under the Policies. *Aetna Cas. & Sur. Co. v. Murphy*, 206 Conn. 409, 417, 538 A.2d 219, 223 (1988). Under Connecticut law, an insured may pursue its claim against an insurer, despite giving late notice, if the insured can rebut the presumption that the insurer was prejudiced by late notice. *Id.*

The *Murphy* court explained that the purpose of a notice provision is to provide the insurer an opportunity for "a timely and adequate investigation of all the circumstances," so that "reasonable compromises and settlements may be made, thereby avoiding prolonged and unnecessary litigation." *Id.* If the insured fails to notify its insurer of a claim within a reasonable time, the insurer's ability to conduct an adequate investigation may be hindered because of loss of memory on the part of witnesses, the loss of opportunity for examination of the physical surrounding, and the possible operation of fraud. 8 John A. Appleman & Jean Appleman, *Insurance Law & Practice*, § 4731, at 2–5 (1981).

In order for AH to prevail on its motion for summary judgment, AH must prove that there is no genuine issue of material fact that (a) UTC did not give AH timely notice of its claim; and (b) UTC is unable to rebut the presumption of prejudice to AH.

### 1. Was UTC's Notice Reasonable Under The Circumstances?

█ The Policies required UTC to notify AH "as soon as practicable" of any "loss

occurring under the policy."[5] Connecticut courts have interpreted "as soon as practicable" to mean "as soon as reasonably can be expected." *Silver v. Indemnity Ins. Co. of North America*, 137 Conn. 525, 528, 79 A.2d 355 (1951). "The duty to give notice does not arise unless and until facts develop which would suggest to a person of ordinary and reasonable prudence that liability may have been incurred, and is complied with if notice is given within a reasonable time after the situation so assumes an aspect suggestive of a possible claim for damages." *Id.* Whether an insured gave notice to an insurer as soon as practicable is a question of law when evidence is undisputed. *Id.* at 529, 79 A.2d 355.

UTC notified AH of a potential claim at the WL site, at earliest, on December 24, 1987, seven years after the CTDEP issued its first clean up order. UTC notified AH of a potential claim at COI, at earliest, on July 20, 1987, more than two years after it discovered the contamination and more than a year after the first clean up order was issued by California Regional Water Quality Control Board.

AH contends that notice was unreasonably late because UTC notified its liability insurer, Liberty Mutual of potential claims at WL a year and eight months before it gave notice to AH and at COI two years and two months before it notified AH. UTC argues that it is improper to compare the notice given to Liberty Mutual and that given to AH because there are distinctions between Liberty Mutu-

al's liability policies and the all-risk property policies issued by AH.[6]

As UTC's liability insurer, Liberty Mutual agreed to defend UTC against claims from third parties, including administrative actions initiated by the government. Under its policies with Liberty Mutual, UTC had a duty to notify Liberty Mutual when it was aware of potential liability from the state and federal environmental agencies in order to give Liberty Mutual the opportunity to defend UTC. The AH Policies do not include a similar duty to notify AH of potential claims. Moreover, AH does not have a duty to defend UTC against claims from third parties.[7]

The Policies require UTC to notify AH when UTC's Home Office knows of a loss occurring under the Policies. *See supra* n. 5. UTC argues that under the circumstances, notice was not unreasonable because the losses and damages "were not immediately apparent and ascertainable, particularly by a home office insurance department far removed from day to day activities at individual sites." However, UTC cannot escape the notice requirement by failing to inform its Home Office of a potential loss.

> The policy requirement that the Insurance Department be informed of the claim or occurrence must be read to include a duty on [the insured] to make its Insurance Department aware of relevant corporate activities. Otherwise, insureds could easily build "Chinese walls" around their insurance departments for the sole purpose of defeating insurance carrier defenses to coverage.[8]

---

**5.** The Policies contained the following notice provision: ☐

> As soon as practicable after any loss or damage occurring under this policy is known to the Assured's Home Office Insurance Department, the Assured shall report such loss or damage with full particulars to Johnson & Higgins of Connecticut.... ☐

**6.** Property policies, such as the one issued by AH, also known as "first party policies," cover losses or damage to the insured's property. Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Disputes*, § 12.12(a)(1994). Liability policies, also known as "third party policies," "comprehensive general liability policies," or "CGL policies," provide coverage for damage caused by the insured to third parties. *See Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 136 (2d Cir.1986).

Hereinafter, the Court will refer to these types of policies as property policies and liability policies, respectively.

**7.** In addition, UTC argues that the Liberty Mutual policies are distinguishable because they required UTC to give "immediate" notice of claims, whereas the AH Policies required notice "as soon as practicable." This argument fails because Connecticut case law does not distinguish between "as soon as practicable" and "immediate;" they both require "notice be given within a reasonable time, under the circumstances." *West Haven v. United States Fidelity & Guaranty Co.*, 174 Conn. 392, 397, 389 A.2d 741 (1978).

**8.** UTC also argues that because the Policies do not expressly provide that the notice provision is

*In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litig.,* 870 F.Supp. 1293, 1360, n. 98 (E.D.Pa.1992), *aff'd in part,* 15 F.3d 1230 (1994), *cert. denied,* 513 U.S. 915, 115 S.Ct. 291, 130 L.Ed.2d 206 (1994).

UTC had a duty to notify AH within a "reasonable time" after the situation at WL and COI suggested a possible claim for damages. *Silver,* 137 Conn. at 528, 79 A.2d 355. In order to determine whether UTC acted reasonably under the circumstances, it is necessary to determine when UTC knew about the losses at each site.

### a. Windsor Locks

As discussed above, UTC's hazardous waste disposal practices and manufacturing operations contaminated the soil, groundwater and surface water at WL. UTC argues that the losses associated with the various areas of contamination changed and evolved over time as the investigations into the property damage progressed. (Pl.Resp.App.Exh. 20.) Thus, UTC argues that under the circumstances, it was reasonable to wait to notify AH until it was sure that the $200,000 deductible was exceeded for each loss.[9] UTC, however, does not dispute that, in the past, it routinely provided AH with prompt notice of losses, regardless of whether they reached the $200,000 deductible.[10]

Even assuming that the deductible is a relevant consideration in determining when to give notice, UTC's erroneous belief that the losses at WL would not exceed the deductible will not render a delay of up to seven years reasonable. "[N]either the negligence nor the mistakes of the insured, if not caused by any act of the insurer, will excuse noncompliance with contractual requirements." 13 Couch on Insurance § 49:53

(1982). The only exception to this rule applies if the insured can show that it "exercised due diligence and reasonable care in ascertaining that there was coverage under the policy." 46A C.J.S., Insurance, § 1248, at 77;

In *Edwards v. Ranger Ins. Co.,* 456 S.W.2d 419 (Tex.Civ.App.1970), the court found that a forty six day delay in giving notice was untimely. The insured, whose aircraft insurance policy had a $250 deductible, argued that the delay was not untimely because he believed that the cost of repairing the damaged aircraft would not exceed $250. *Id.* at 421. The court was unimpressed finding that "a policyholder who fails to give notice of [an] accident has the full duty of investigating it, and if, in the light of a full investigation, information is not obtained precluding every reasonable hypothesis that there was injury or damage (as to which the policy had application) resulting therefrom, he will not be relieved of compliance with the provisions of the policy relating to prompt notification." *Id.*

During the seven years between the initial discovery of contamination at WL and the date UTC notified AH, four governmental orders were issued requiring UTC to remediate the contamination at WL. Although UTC appears to have devoted substantial effort to comply with the governmental orders, UTC failed to fulfill its duty to exercise due diligence and reasonable care in ascertaining whether the situation suggested a possible claim for damages. *Silver,* 137 Conn. at 528, 79 A.2d 355. UTC's uncertainty that the deductible would not be met will not excuse its delay in providing notice. Accordingly, notice of the damage at WL was untimely as a matter of law.

a "condition," it did not realize the consequences of untimely notice. However, UTC fails to cite any authority for its position that a sophisticated party to a contract would not understand this provision to be a condition. In addition, the notice provision is enumerated along with numerous other terms of the policy that UTC does not dispute are conditions of the Policies.

9. UTC admits that there was only one loss at COI, but argues that each of the sources of contamination at WL constitutes a separate loss.

10. UTC sent AH notice on July 25, 1985, for a loss occurring on July 24, 1985. The loss was the result of a fire and explosion in a laboratory which UTC estimated to be worth $100,000. Additionally, UTC sent AH notice on January 7, 1986, for a loss occurring on the same day. The loss was the result of a fire in some duct work causing damage to the duct work and some "blistered paint." UTC estimated the amount of the loss at "$500.00 (or under)."

### b. City of Industry

The parties do not dispute that UTC spent $1,479,839.66 in "site investigative costs" from August 1985 to July 1987, when it gave AH notice. (Pl. Response to Material Facts Not In Dispute, ¶ 122.) Thus, UTC had substantially exceeded its $200,000 deductible before giving notice to AH. UTC claims that it was not certain how much of these costs would not be covered by its liability insurance. Because of this uncertainty, UTC contends that it did not believe there would be a claim under the Policies.

As discussed above, an insured's erroneous belief that it would not need coverage, if not caused by the insurer, will not excuse the insured from complying with the notice requirement. Further, as demonstrated by UTC's past practice and the case law, an insured's duty to give notice does not arise when it is *certain* to have a claim, but rather, the duty arises when the insured is aware of circumstances suggestive of the *possibility* of a claim. *Silver*, 137 Conn. at 528, 79 A.2d 355.

■ The Policies require notice "as soon as practicable." This does not allow UTC to give notice when it strategically decides to or when it has no other alternative. To allow the insured to delay notice hinders the insurer's ability to investigate and set reserves within the scope of coverage and is inconsistent with a common sense meaning of the policy's language, as well as UTC's apparent practice in other instances. The Court holds that notice of the claim at COI was unreasonably late as a matter of law.

### 2. Did AH Waive the Notice Requirement?

In its opposition to AH's motion for summary judgment, UTC contends that AH is precluded from arguing that notice was untimely because AH, once having received notice, failed diligently to conduct its investigation and make a coverage determination.

■ The cases UTC cites to support its contention that AH waived the notice requirement by its claims handling practices are factually distinguishable because they involved insurance companies that regularly denied claims without conducting investigations or that failed to get involved with the insured's investigation. *Travelers Ins. Co. v. Central Nat'l Ins. Co. of Omaha*, 733 F.Supp. 522, 531 (D.Conn.1990); *Maryland Cas. Co. v. Wausau Chem. Corp.*, 809 F.Supp. 680, 695 (W.D.Wis.1992). Here, it is undisputed that AH never denied coverage for the claims and AH made numerous requests to UTC for information necessary to evaluate the claim. Furthermore, AH contends that it was UTC's conduct that hindered its ability to "get involved with the insured's investigation."

Finally, there is some support for AH's assertion that it preserved its late notice defense. UTC's domestic property manager, Harold Packman, testified that AH "immediately" informed him that there was a potential problem with untimely notice. *See National Union Fire Ins. Co. v. Mastroni*, 754 F.Supp. 269, 272 (D.Conn.1990) (no waiver of right to disclaim coverage based upon breach of a policy condition when insurer reserved its right to disclaim coverage). In light of the above, the Court cannot find as a matter of law that AH waived the notice requirement.

### 3. Was AH Prejudiced by Late Notice?

AH contends that its ability to investigate the claims at WL and COI was prejudiced because before it received notice (a) physical evidence and documents were destroyed; (b) important witnesses died or their memories dimmed; (c) UTC spent substantial money to comply with government mandates; and (d) the physical appearance of the sites changed. Thus, AH argues that UTC cannot establish any genuine issue of material fact to rebut the presumption of prejudice. *See Olin Corp. v. Insurance Co. of North America*, 771 F.Supp. 76 (S.D.N.Y.1991), *aff'd*, 972 F.2d 1328 (2d Cir.1992).

AH's argument that it was prejudiced because UTC entered into consent decrees with several government agencies and spent substantial money cleaning the contamination before notifying AH fails to recognize the distinction between property insurance and liability insurance. *See supra* n. 5. The

cases finding that these activities prejudiced the insurer involved liability insurance policies which specifically provided that the insurer had the right to be involved in the defense of any claim which may create liability for the insurer under the policy. *See, e.g., Fireman's Fund Ins. Co. v. ACC Chem. Co.*, 538 N.W.2d 259, 263 (Iowa 1995). AH, as an all-risk property insurer, did not have any such right under the Policies and therefore was not prejudiced by these activities.

The Policies cover all risks of loss except those that are specifically excluded. In order to determine whether UTC's property was damaged by an excluded peril, AH must be able to determine the source of the contamination. AH argues that it was prejudiced because its ability to reconstruct the cause and timing of the specific contaminating events was hindered by the late notice. According to AH, the physical attributes of the COI and WL properties were changed; in addition, many of the practices that caused the contamination have long been discontinued and witnesses with knowledge of the contaminating events are dead, unavailable or no longer remember important information. Furthermore, AH argues that it was deprived of the opportunity to investigate the COI facility and events occurring at the plant, including the ongoing monitoring and remediation activities in 1985, when such investigation would have been meaningful.

UTC argues that AH's ability to investigate the loss at WL and COI has not been prejudiced because the numerous reports prepared by the government and engineers give AH a full and accurate understanding of the damage at WL and COI. AH has received 20 engineering reports on COI and 34 on WL documenting the damage and potential causes of the contamination, many of which were prepared shortly after each individual area of contamination was identified. Moreover, UTC contends that AH's claim of prejudice is specious because at least three of the nine witnesses identified by AH died "well after" AH was notified of the claim and

any potential testimony of the other of the witnesses has been developed at length by other witnesses or reports. Finally, UTC argues that AH is not prejudiced by any missing documents or alteration of the physical site because AH is adequately protected by the abundance of evidence available.[11] *See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 89 F.3d 976 (3d Cir.1996), *cert. denied*, ── U.S. ──, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996) (denying insurer's claim that it was prejudiced because witnesses had died and evidence was lost because there was a wealth of relevant documentary evidence and the site designer was available for cross examination); *Hartford Postal E.F.C.U. v. Colonial Penn Ins. Co.*, 1995 WL 79811 (Conn.Super. Feb 9, 1995).

█ In *Aetna Cas. & Sur. Co. v. Murphy*, the Connecticut Supreme Court noted that the determination of prejudice requires a factual inquiry. *See Murphy*, 206 Conn. at 417–18, 538 A.2d 219. Thus, the question of prejudice is properly left for the finder of fact unless the facts are undisputed. *See* Appleman, *supra* § 4746, at 198–199. Here, a triable issue of fact exists as to whether UTC's evidence adequately rebuts the presumption of prejudice. Although AH has presented substantial evidence of changes that have occurred at the sites and of witnesses who are no longer available, AH does not explain how it is prejudiced by the missing information or witnesses. For purposes of summary judgment, it is not sufficient for AH to merely state it was prejudiced without specifically identifying how it was prejudiced and articulating with greater precision why UTC's documentation is insufficient to cure such prejudice. AH's general reference to having difficulty reconstructing the cause of the contamination is insufficient to establish the necessary causal relationship. Although UTC's recital of the volumes of documents produced and the numerous witnesses that are available will not alone rebut the presumption of prejudice, they at least raise a

---

11. In addition, UTC argues that AH was not "prejudiced" because (a) AH never planned to investigate this claim, but rather planned to litigate it; and (b) AH's view that its Policies do not apply to environmental claims would not have

been resolved simply by giving AH earlier notice. As discussed in detail *infra*, section L, there is a genuine dispute of material fact as to whether AH adequately investigated UTC's claim.

genuine dispute of fact regarding whether UTC cured any material prejudice to AH.

### C. Whether Contamination Is An Insured Peril Under The Policies

UTC argues that in the absence of any dispute as to the existence of contamination at WL and COI, it is entitled to a determination that this contamination is covered under these "all risk" Policies covering all physical loss or damage even though it was not enumerated in the Policies, because there was no specific exclusion.[12] *See Ins. Co. of North America v. Gypsum Co.*, 678 F.Supp. 138, 141 (W.D.Va.1988), *aff'd*, 870 F.2d 148 (1989); *see also* Eugene Anderson, et al, *Policyholder Claims for Insurance Coverage Because of Environmental Damage*, ALI–ABA 427, 529–31 (1989). This is in contrast to a "named peril" policy in which an insurer specifies the perils it will cover and the policyholder bears the risk of any unknown or unforeseen cause of damage. *Id.*

UTC argues that AH could have included contamination among the perils specifically excluded from the Policies, but did not do so, thereby accepting "all risks," including contamination. In fact, at the same time AH issued the first and second policies to UTC, it issued "all-risk" policies to Carrier which specifically excluded contamination. AH argues that exclusions contained in other policies drafted by AH at the same time are

irrelevant to construing the Policies at issue here, but fails to factually distinguish the circumstances related to the issuance of the Policies here from the other policies issued by AH during the same time period or to provide the Court with any legal authority for its argument.

Moreover, AH contends that the determination of whether contamination is a covered peril is inextricably linked to the fact-intensive question of whether the loss was fortuitous or to a determination of whether an exclusion, such as gradual deterioration, applies. The Court is not persuaded. Here, UTC is merely arguing that contamination is a covered peril under the Policies. A determination that contamination is a covered peril does not foreclose AH from claiming that, despite being a covered peril, the loss is not covered because other conditions of the policy, such as fortuity, were not satisfied.[13] Accordingly, the Court finds that contamination is a covered peril under the "all risk" Policies because it is not specifically excluded.

### D. Whether UTC Has An "Insurable Interest" In The Contaminated Property

When evaluating any claim under a property insurance policy, the initial inquiry is whether the insured had an "insurable interest" in the damaged property at the time of

---

12. Paragraph 8 of the Policies provides: ☐

> This policy insures against all risks of physical loss or damage to property described herein, including general average, salvage, and all other charges on shipments covered while waterborne or airborne and including expense of removal of debris of such property damaged by an insured peril, except as hereafter excluded.

13. AH argues that those portions of UTC's motion for partial summary judgment which seek a legal ruling in the form of a declaration as to the meaning of certain terms of the Policies are in effect, attempts to have this Court issue an advisory opinion because they will not dispose of any breach of contract claim. AH argues that UTC's motion should be denied because advisory opinions are prohibited by Fed.R.Civ.P. 56. *See Dexler v. Carlin*, 1986 WL 6476, *3 (D.Conn.1986) (denying summary judgment on the issue of whether the defendant should have considered the plaintiff for other jobs in a complaint alleging defendant failed to provide reasonable accommo-

dation because it would not dispose of any claim in the case). *Sodowski v. Wheat First Sec.*, Civil No. H–83–424 (Feb. 27, 1987) (Cabranes, J.) (motion does not fall within the intended ambit of Rule 56 or 56(d) because it will in no way would dispose of any claim or even a part of any claim) (citing *Capitol Records, Inc. v. Progress Record Distributing, Inc.*, 106 F.R.D. 25, 29 (N.D.Ill.1985)) ("Rule 56 ... is not to be used to justify numerous and repetitive motions seeking to resolve limited factual motions in a piecemeal fashion"). The Court concludes otherwise. The cases cited by AH are distinguishable because in this case, the determination of whether "contamination" is an "insured peril" is a potentially dispositive issue. Similarly, the other issues in the summary judgment motion (i.e. the determination of whether land and natural resources are included in the definition of real property; whether there was a "physical loss" as defined by the Policies; and whether UTC has a cognizable interest in the groundwater) are potentially dispositive of at least part of UTC's claim.

the loss. Jerry Provencher, "First–Party Claims With an Environmental Twist," 23 *ABA Brief* 8 (Summer, 1994). UTC argues that as a matter of law, it has an insurable interest in the soil and groundwater at WL and COI and the surface water at WL because the parties agree that these areas have been contaminated and require remediating. Perhaps because AH contends that groundwater is not "covered property" under the Policies, it does not address whether UTC has an insurable interest.

The determination of whether UTC has an insurable interest in groundwater is distinct from whether groundwater is "covered property." The "insurable interest" analysis involves whether the insurance policy is unenforceable or void because it fails to protect any interest of the insured. 3 Couch on Insurance 3d § 41:1 ("Today, it is universally held, either by force of statute or upon public policy grounds, that insurable interest is necessary to the validity of a policy, no matter what the subject matter."). The question of whether "covered property" was damaged is reached only after finding the policy is valid. Because "insurable interest" and "covered property" issues are distinct, the Court will address them separately.

■ "Generally speaking, a person has an insurable interest in property whenever he [or she] would profit by or gain some advantage from its continued existence or suffer some loss or disadvantage by its destruction. If the insured would sustain a loss by the destruction of the insured property, it is immaterial whether he or she has any title in, lien upon, or possession of, the property itself." 3 Couch on Insurance 3d § 41:11. Under Connecticut law, the critical question is whether the insured will be "directly and financially affected by the loss of the property insured.... This opens a wide field and the decisions take an extensive range with a growing tendency to expand rather than to

contract the scope of the term." *Plum Trees Lime Co. v. Keeler,* 92 Conn. 1, 101 A. 509 (1917).

■ Here, it is undisputed that UTC is directly liable for the cost of remediating the contamination of the water and soil at WL and COI. Because UTC sustained financial loss by the contamination of the soil and water, UTC has an insurable interest. Accordingly, UTC's motion for summary judgment is granted.

### E. Whether Water And Soil Constitute "Covered Property" Within The Meaning Of The Policies.

The Policies insure "all real and personal property" owned by UTC. In addition, the Policies insure the property of others in which UTC has care, custody or control.[14] UTC urges the Court to find as a matter of law that the term "real property" includes soil and water. AH urges the Court to find as a matter of law that the groundwater at COI is not "covered property" within the meaning of the Policies because it is neither owned by UTC nor within UTC's care, custody or control. The Court will address each of these issues in turn.

### 1. Real Property

The term "real property" is not defined in the Policies. UTC argues that the plain meaning of the term "real property" includes soil and water. AH argues that summary judgment should not be granted because "real property" is an ambiguous term, and extrinsic evidence will show that "real property" was intended to refer only to buildings, not land.

■ An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract. *Hammer v. Lumberman's Mut. Cas. Co.,* 214

---

14. Section 7(a) of the Policies provides: □
Except as hereinafter excluded, this policy covers:
(1) The interest of the Assured in all real and personal property owned, used or intended for use by the Assured, or hereafter erected, installed, or acquired including while in course of construction or erection, and including interest in improvements and betterments in buildings not owned by the Assured.

(2) The interest of the Assured in the real and personal property of others in the Assured's care, custody or control, and the Assured's liability imposed by law or assumed by contract, whether written or oral, for such property.

Conn. 573, 583, 573 A.2d 699 (1990). "When interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *O'Brien v. U.S. Fidelity and Guaranty Co.*, 235 Conn. 837, 843, 669 A.2d 1221 (1996).

UTC argues that "real property" is not an ambiguous term and should be interpreted in accordance with its plain and ordinary meaning. *See Horning Wire Corp. v. Home Indemnity Co.*, 8 F.3d 587 (7th Cir.1993) ("land is merely a subset (though admittedly a big one) of the broader category of real property"); *Westinghouse Elect. Corp. v. Liberty Mut. Ins., Co.*, No. L–69352–8 (N.J.1992) (finding that the term "real property" as used in an all risk policy is standard insurance language and carries no unique meaning in insurance context).

"Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." *24 Leggett Street Ltd. Partnership v. Beacon Industries*, 239 Conn. 284, 295, 685 A.2d 305 (1996). The Second Circuit and Connecticut courts regularly rely on dictionaries to determine the plain and ordinary meaning of an insurance policy term. *See e.g. Cunninghame v. Equitable Life Assur. Society*, 652 F.2d 306, 309 (2d Cir.1981); *Providence Washington Ins. Group v. Albarello*, 784 F.Supp. 950, 953 (D.Conn.1992). Standard dictionaries, as well as legal and insurance dictionaries, define real property as including land, soil, and water.[15]

AH does not dispute that the ordinary meaning of "real property" includes land. However, AH argues that, looking at the Policies as a whole, rather than the isolated phase "real property," reveals an ambiguity. In finding an ambiguity, AH argues that the Policies provide a method for valuing property that is damaged.[16] Because the Policies include a method for valuing buildings, but not land or natural resources, AH contends it is unclear whether land is included in the term "real property".

Paragraph 11 of the Policies provides that all covered property not otherwise provided for in the valuation scheme should be valued at "actual cash value at the time and place of loss". AH contends that because UTC is not seeking the "actual cash value" of the property, but rather is seeking to be reimbursed for the costs expended in the cleanup supports its proposition that the Policies do not cover land.

The valuation provision does not have any bearing on whether there is coverage for a particular claim. Although the Policies provide that all other property is to be valued at "actual cash value," this is not the only means of valuing damage. The Policy in effect from 1981—1986 also provide for coverage of expenses incurred in removing debris[17] and all of the Policies provide for "expenses to reduce loss."[18] Thus, UTC's failure to seek actual cash value for its land does not import an ambiguity into the Policies, but rather is consistent with the plain language of the Policies.

**15.** *Webster' New Twentieth Century Dictionary of the English Language* (2d ed.1990) defines real property as synonymous with real estate and defines real estate as: "1. Land, including the buildings or improvements on it and its natural assets, *as minerals water, etc...*" Furthermore, *Black's Law Dictionary* 1218 (6th ed.1990), defines real property as "[l]and, and generally whatever is erected or growing upon or affixed to land..." Land is defined as "...any ground, soil, or earth whatsoever; including fields, meadows, pastures, woods, moors, waters, marshes, and rock...." *Id.* at 877.

**16.** Paragraph 11 of the Policies provides a method for valuing finished goods, raw stock, improvements and betterments, accounts, mechanical drawings, documents, patterns, molds, jigs,

dies, tooling. In addition, it provides that other property is to be valued "at actual cash value at time and place of loss unless otherwise endorsed hereon."

**17.** Paragraph 7(a)(5) provides that "this Policy covers... (5) [e]xpenses incurred in removal of debris of the property covered hereunder which may be occasioned by loss by a peril not otherwise excluded".

**18.** Paragraph 7(b)(3) provides that "[t]his policy also covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy, even though such expense may exceed the amount by which the loss under this policy is thereby reduced."

Paragraph 19 of the Policies, entitled "Premium Adjustment" requires UTC "to furnish [AH with] a statement of aggregate values of buildings, structures, and personal property..." The premium is adjusted based on the submitted values. AH argues that "real property" is ambiguous because the Policies' premiums were not adjusted to reflect the values for land and natural resources. However, the amount of the premium cannot be used to affect the plain terms of the contract. 2 Couch on Insurance § 22:47, at 22–97 (1996) ("[a]lthough the amount of the premium cannot affect the plain terms of the contract, it is a fact to be taken into consideration in construing doubtful clauses in a policy."); *see also Transamerica Ins. Co. v. Bellefonte Ins. Co.,* 548 F.Supp. 1329, 1331 (E.D.Pa.1982) (only reaching premium issue after finding ambiguity in the policy); *McNeilab Inc. v. North River Ins. Co.,* 645 F.Supp. 525, 540 (D.N.J. 1986), *aff'd,* 831 F.2d 287 (3d Cir.1987) (same).[19] Here, the plain terms of the agreement provide coverage for "real property."

■■■■ "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers and laymen contend for different meaning." *Barnard v. Barnard,* 214 Conn. 99, 110, 570 A.2d 690 (1990) (citations and quotations omitted). Here, AH has failed to provide the Court with any authority for the proposition that "real property" is an ambiguous term. Nor does AH refer the Court to any sources, such as dictionaries, that define real property to exclude land. When Policy terms are unambiguous, they must be given

their plain and ordinary meaning and extrinsic evidence is inadmissible to determine the meaning. *Cunninghame v. Equitable Life Assurance Soc'y of the United States,* 652 F.2d 306, 308 (2d Cir.1981); *TIE Communications, Inc. v. Kopp,* 218 Conn. 281, 288–89, 589 A.2d 329, 333 (1991). Finding no ambiguity and no dispute of material fact, the Court grants summary judgment.

**2. Groundwater at COI**

AH urges the Court to find as a matter of law that the groundwater at COI is not "covered property" under the Policies because UTC does not own it or have care, custody or control of it.[20] It is undisputed that the groundwater at COI is public property as a matter of California law and thus, can not be privately owned by UTC. Cal. Water Code § 102.[21] Consequently, the groundwater is not covered by the Policies unless it is within UTC's "care, custody or control" such that UTC is subject to legal liability for causing damage to it.

AH contends that UTC cannot claim it has "care, custody, or control" over the COI groundwater because its subsidiary, Carrier Corporation, submitted a statement to a California Superior Court in which it claimed to "not own or have any interest in the groundwater it has been ordered to clean up." *See Carrier Corp. v. Detrex Corp.,* No. C703625, Slip op. (Cal.Super.Ct. October 28, 1988) (Def.App.Exh. 123). However, according to UTC, this statement was made in the context of whether Carrier sustained damage to its property. Here, the question is notwithstanding UTC's lack of ownership, did UTC have sufficient "care, custody, or control" of the groundwater for coverage under the Poli-

---

**19.** AH argues that the rule of *contra preferentum,* which requires an insurance policy to be construed against the insurer, does not apply because the Policies are the result of a bargained for contract between sophisticated parties. In *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4 (2d Cir.1983), the court noted that there is an unresolved question as to whether to construe a policy against an insurer when the case involves a bargained for contract between sophisticated parties. The Court need not address this issue because the rule of *contra preferentum* is a rule of last resort, only utilized when all aids to construction have been employed and have failed to resolve the ambiguity. As discussed above, there

is no ambiguity in the term "real property." *Kelly v. Figueiredo,* 223 Conn. 31, 35, 610 A.2d 1296 (1992); Couch on Insurance 3d § 21:1 (1995).

**20.** AH only seeks summary judgment on the groundwater at COI, not WL.

**21.** Section 102 of the California Water Code states that "All water within the State is the property of the people of the State, but the right to use of water may be acquired by appropriation in the manner provided by law."

cies. Because AH failed to provide the Court with sufficient information regarding the context of UTC's "admission" that it does not have an interest in the groundwater, summary judgment is inappropriate on this basis.

Several courts have considered whether groundwater contamination was covered under liability policies, but the parties did not present, nor has the Court found any cases in which groundwater was found to be 'covered under a property policy. *See e.g. Lane Elec. Coop., Inc. v. Federated Rural Elec. Ins. Corp.*, 114 Or.App. 156, 834 P.2d 502, 505 (1992). As discussed above, liability policies generally insure damage to the property of another caused by the insured, whereas a property policy covers the insured's property. *See supra* n. 5.

Liability policies contain "owned property exclusions" which generally provide that it does not cover property owned by the insured or property of others in the insured's care, custody, or control. The purpose of the owned property exclusion is to prevent a liability policy from covering property policy losses. *Pejcha Revocable Trust v. State Farm Fire & Cas. Co.*, 1996 WL 417259 (N.D.Cal., July 23, 1996); *Olds–Olympic, Inc. v. Commercial Union Ins. Co.*, 129 Wash.2d 464, 918 P.2d 923 (1996).

Of those courts that have examined whether ownership of groundwater was excluded under the owned property exclusion, "the majority of jurisdictions ... have concluded that groundwater below real property does not 'belong' to the property owner," and thus was covered under the liability policies. *Reliance Ins. Co. v. Armstrong World Industries*, 292 N.J.Super. 365, 678 A.2d 1152, 1159 (1996). Generally these courts have found that the nature of groundwater is inconsistent with the insured's ownership or "care, custody or control." *Id.* "Some courts have expressly concluded, largely based on environmental statutes... that groundwater is a public resource belonging to the government and is thus 'third party' property...." *Id* (citing *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1565 (9th Cir.1991) (under a California statute all water within the state was state property, and therefore damage to

groundwater was not excluded under the owned property exclusion); *State v. New York Cent. Mut. Fire Ins. Co.*, 147 A.D.2d 77, 542 N.Y.S.2d 402, 403 (1989) (court held that under New York law groundwater is a natural resource protected by the State as trustee for the public, and therefore oil that had either entered the groundwater or threatened to do so caused damage to the property of a third party)).

"Some courts have gone even farther, clearly expressing that the state's interest in groundwater is a property right." *Reliance*, 678 A.2d at 1160 (citing *C.D. Spangler Const. Co. v. Industrial Crankshaft*, 326 N.C. 133, 388 S.E.2d 557, 563 (1990)) (where the court noted that injury to the State's natural resources is property damage under [a liability policy] because the state's interest in protecting its natural resources is a property right.). Alternatively, numerous other courts have reasoned that "groundwater in its natural state cannot be deemed 'property' that is 'owned' by anyone." *Id.* (citing *Gerrish Corp. v. Universal Underwriters*, 947 F.2d 1023 (2d Cir.1991) (the 'presence of ... pollution in ... groundwater' was 'proof of damages to property not owned, controlled or possessed by the insured'); *U.S. v. Conservation Chem. Co.*, 653 F.Supp. 152, 200 (W.D.Mo.1986) (district court adopted a special master's conclusion that because groundwater is not "owned or controlled" by the insured, the owned property exclusion did not apply)).

■ The Court finds it difficult to conceptualize how groundwater, which is transient or migratory in nature, could be under UTC's "care, custody or control."

"At the least, groundwater is unique. Unlike other property that is normally considered as being within the four corners of one's deed, groundwater not only flows, trickles or runs or oozes through the land from one place to another, but other than being a source of potable water, it is certainly not susceptible to the custody or control of a property owner."

*Morrone v. Harleysville Mut. Ins. Co.*, 283 N.J.Super. 411, 662 A.2d 562, 566 (1995) (internal citations and quotations omitted).

Viewed more existentially, "the water continually flowed and flowed and yet it was always there; it was always the same and yet every moment it was new." Hermann Hesse, *Siddartha*, at 102 (1976).

Because UTC's groundwater damage claim is to the property of third parties, which the Court concludes cannot be deemed within UTC's care, custody or control, it is not covered under these property damage Policies, and the Court will grant AH's motion for summary judgment regarding groundwater at COI.

### F. *Whether WL and COI Suffered "Physical Damage" Within The Meaning Of the Policies.*

The parties filed cross motions for summary judgment urging the Court to rule as a matter of law on whether there was "physical loss or damage" at WL and COI within the meaning of the Policies. UTC argues that its motion for summary judgment should be granted because there is no dispute of material fact that the soil and water at WL and the soil at COI were damaged by contamination. AH contends that no "physical loss or damage" occurred within the plain language of the Policies because UTC's damages are related to investigating the contamination and complying with government orders, not to cleaning up the contaminated property.

Property insurance provides coverage for physical loss or damage to the insured's property, "[t]hus actual physical injury or destruction [to the insured's property] must occur before the policy will respond to a loss." Provencher, "First Party Claims With An Environmental Twist," *supra* at *10. There is no dispute that the soil and water at WL and the soil at COI have been contaminated. Furthermore, it is undisputed that UTC was responsible to government agencies for remediating the actual physical injury of contamination.

There is nothing in the Policies nor is there any legal authority which precludes UTC from recovering for losses sustained on its own property while also seeking coverage under its liability for any damage caused to third parties. Furthermore, there is no legal authority to support AH's apparent position

that there can be no claim as a matter of law for "property damage" once the government is involved.

A similar argument under New York law was rejected by the Second Circuit in *Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178 (2d Cir.1995), *modified on other grounds and reh'g denied*, 85 F.3d 49 (2d Cir.1996). In *Stonewall* a liability insurance policy which provided coverage for any property damage the insured, a manufacturer of asbestos products, caused to third parties. *Id.* at 1208. The insurer argued that the underlying claims against the insured were not for "property damage" because they "are merely for the costs of prophylactic measures undertaken by the buildings owners, and that such costs represented only the expenses incurred to comply with government imposed health and safety standards." *Id.* The Second Circuit rejected the insurer's argument, finding that "the claimants' buildings have suffered 'physical injury' as a result of the installation of [asbestos containing materials] .... The damage is from the release of fibers into the building, not from the regulatory requirement that the asbestos be removed, even though the cost of removal may be an appropriate item of damages." Here, there is undisputed evidence that UTC's property has been damaged by the release of various contaminants. While some of the costs plaintiff is seeking to recover may not be provably related to remedying the pollution damage to plaintiff's property, the Court declines to find as a matter of law that money expended to comply with the government orders to investigate the nature and scope of the necessary remediation of its contaminated property does not constitute physical loss or damage. The attribution of damages to remedy of UTC's own property loss is a matter properly left for trial.

AH further contends that the expenses UTC incurred to comply with the government orders were designed to protect the environment and the health of the general public and adjoining landowners, not to protect UTC's own property, and thus are not covered under the property insurance policies. Again, the issue for purposes of coverage should not be whether the money was

expended to comply with a governmental order, but rather whether the money was expended solely to remedy damage to UTC's own property. To the extent money was expended to remedy damage caused to others, AH, as an all-risk property insurer, is not liable. However, on the basis of the record, the Court cannot determine which expenses were incurred to remedy UTC's property and which were expended solely to remedy property of others with no remedial benefit for UTC's property contamination problem. AH's concern that UTC is seeking coverage for costs incurred to comply with government order were intended to remedy damage to third parties is appropriately addressed when determining the amount of the losses covered, not whether there is coverage. Accordingly, AH's motion for summary judgment is denied and UTC's motion for summary judgment is granted.

### G. Whether The Losses At WL Were Fortuitous.

■ Property insurance policies cover only losses caused by "fortuitous" events. Stephen A. Cozen, *Insuring Real Property*, § 50.03[5] (Matthew Bender & Co.1995); *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F.Supp. 164, 192 (D.Conn. 1984). In order for a loss to be fortuitous, it must be the result of a chance event. *Standard Structural*, 597 F.Supp. at 193 ("an event which is certain to take place or is inevitable is not fortuitous"). AH argues that the losses at WL cannot be deemed fortuitous because UTC's losses at WL were the result of UTC's hazardous waste disposal practices and operating practices.

"Fortuity is judged using a subjective standard. Thus, in order to avoid coverage, it must be proved that the insured was aware that the loss would occur at the time the policy was formed. Accordingly an insurer must not only link the insured to the deposit of hazardous waste but also must prove that the insured knew that environmental damage would result." Cozen, *Insuring Real Property, supra; see also* Restatement (Second) of Contracts, § 291 comment A (defining a fortuitous event as "an event which so far as the parties to the contract are aware, is dependent on chance"); *Standard Structural,* 597 F.Supp. at 193 ("damage is fortuitous if neither party knew or contemplated that there was any defect at the time of the issuance of the insurance contract.").

The parties agree that there is no evidence that UTC misrepresented or fraudulently concealed information from AH, thus the sole issue is whether UTC had a good faith belief that no loss had occurred at WL at the inception of the Policies.

The determination of whether a loss was fortuitous should focus on whether UTC knew of a *loss* under the Policies, not whether UTC knew of the cause of the damage. *Insurance Co. of North America, v. U.S. Gypsum Co.*, 870 F.2d 148, 152 (4th Cir. 1989). Thus, it is irrelevant to the fortuity analysis that the contamination was the result of UTC's regular business practices, because it is the fortuity of the resulting loss, not the fortuity of the intentional actions causing the loss that is at issue. *Aluminum Co. of America v. Accident & Cas. Ins. Co.*, No. 92-2-28065-5, slip op. at n. 3 (Wash.Super.Ct. October 10, 1995).[22] AH argues that this case is analogous to *Aetna Ins. Co. v. Sachs*, 186 F.Supp. 105, 108-09 (E.D.Mo. 1960), in which the court denied insurance coverage for a rug damaged by a pet poodle's indiscretions. Here, although UTC may have known the waste disposal practices were occurring, a question of fact exists regarding whether UTC knew at the time it contracted for AH's insurance coverage that these practices would cause environmental damage. The same cannot be said of the owners of the poodle as illustrated by the pet

---

22. AH presented the Court with no authority for the proposition that contamination caused by a businesses ongoing activities are not fortuitous. The cases cited by AH were not analyzing the fortuity requirement in a property insurance policy, but were determining whether an exclusion under a liability insurance policy for releases that were not "sudden or accidental" applied.

*American Mut. Liab. Ins. Co. v. Neville Chem. Co.,* 650 F.Supp. 929, 933 (W.D.Pa.1987); *Technicon Electronics Corp. v. American Home Assurance Co.,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989), *reargument dismissed* 74 N.Y.2d 843, 546 N.Y.S.2d 560, 545 N.E.2d 874 (1989), *reargument denied* 74 N.Y.2d 893, 547 N.Y.S.2d 851, 547 N.E.2d 105 (1989).□

world's emphasis on effective house training techniques.

In *CPC Int'l Inc. v. Aerojet–General Corp.,* 825 F.Supp. 795 (W.D.Mich.1993), the court granted the insurer's motion for summary judgment because the insured's waste disposal practices, including burying drums, spilling chemicals, and dumping hazardous waste, were not fortuitous. However, the facts in *CPC* demonstrated that the insured knew at the relevant time not only of the hazardous business practices, but also of the resulting contamination. *Id.* at 812–13. For instance, several years before the insurer issued its policies, the insured (a) received letters from governmental authorities regarding contamination and water quality; (b) began treating its property for groundwater contamination; and (c) received internal memoranda from employees documenting the contamination. *Id.* at 812. Here, the government did not begin investigating UTC's property until 1979, four years after the policies took effect, and AH has failed to come forward with any evidence that UTC's employees subjectively knew of the contamination. Instead, AH relies on evidence that it was "generally known" in the scientific community that UTC's practices caused contamination.

AH's expert, Melvin Schniedermeyer, testified that between 1970 and 1975 there were several newspaper-reports on VOC contamination and environmental problems caused by PCBs. In addition, AH contends it was "generally known" that chromium posed risks to the environment as evidenced by safety instructions published by the Manufacturing Chemists Association. Schniedermeyer further testified that UTC officials always were well-aware of current environmental knowledge.

UTC's expert Richard T. Dewling disputes what was "generally known" at the relevant time. He reviewed the practices at WL, including the use of sludge beds, disposal of sludge in a natural ravine, burial of drums, fire training activities, as well as the discovery of the chromic acid leak in the tank and concluded that, in his opinion, UTC did not expect these practices to cause loss or damage to the environment. (Pl.Resp.Exh. 93). Moreover, Dewling disputes AH's contention that it was generally known that UTC's practices at WL could cause loss or damage. "[R]egulators and other engineers and industrial professionals did not expect that loss and damage in the form of contamination to soil, groundwater and sediments would result from these generally established, and offtime accepted industrial practices." *Id.*

Further, numerous UTC employees testified at depositions that they did not know that their operations and practices could cause damage. (See, e.g., Depo. Douglas A. Snowdon, Pl.App. Exh. 82) ("When I was involved with the [WL] waste treatment plant I never expected to see elevated levels of these contaminants coming out of the sludge. The feeling and the philosophy at the time was once I produced a hydroxide sludge that was deemed stable ... and as such it was not going to leach in any grade.")

Disposal practices which may be no less than utterly shocking by today's standards may nonetheless be demonstrated to have been unknowing as of 1975 or careless with the environmental consequences not reasonably foreseeable at that time. What is clear is that the nature of UTC's knowledge in 1975 is hotly disputed and the question of whether UTC knew its disposal practices were likely to result in hazardous soil and water contamination is properly left for a jury to weigh the experts' evidence on what was known about the sources and nature of the contamination in the context of UTC's business practices at the time of the Policies issuance.

AH contends that under the doctrine of collateral estoppel, UTC is prohibited from arguing that the losses were fortuitous on the basis that a Massachusetts Superior Court granted partial summary judgment to third party insurers, finding, *inter alia,* that the contamination at WL had not been caused by any accidental release, but rather was the result of UTC's regular operating practices. *See UTC v. Liberty Mut. Ins. Co.,* No. 87–7172 (Mass.Super.Ct. Aug. 3, 1993).

"The full faith and credit statute, 28 U.S.C. § 1738, provides that [state] judicial proceedings ... shall have the same full faith and credit in every court within the United States

... as they have by law or usage in the courts of such State ... from which they are taken. Accordingly, a federal court must give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Doctor's Associates, Inc. v. Distajo,* 66 F.3d 438, 446 (2d Cir.1995), *cert. denied* 517 U.S. 1120, 116 S.Ct. 1352, 134 L.Ed.2d 520 (1996) (citations omitted). Thus, the question is whether a Massachusetts court would give preclusive effect to the state court decision.

 Under Massachusetts law, the test for application of collateral estoppel requires an affirmative answer to each of the following questions:

1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom estoppel is asserted a party or in privity with a party to the prior adjudication?

4. Was the issue decided in the prior adjudication essential to the earlier judgment?

*Fay v. Federal National Mortgage Assoc.,* 419 Mass. 782, 647 N.E.2d 422, 427 (1995).

 AH has failed to establish that the determination of how the losses were caused at WL was "essential" to the Massachusetts' decision. The Massachusetts court granted summary judgment after finding that the third party insurance policies obligated the insurers to defend UTC from any *suit* seeking damages from injury or destruction. The court granted summary judgment on the WL site solely based on its determination that the consent orders issued by the government agencies did not constitute "suits for property damages." Thus, the court's discussion of UTC's operating practices was not "essential" to its holding. *UTC v. Liberty Mutual,* slip op. at 73. Accordingly, the Court denies AH's motion for summary judgment by application of the collateral estoppel doctrine and concludes that a jury determination is required on the state of UTC's knowledge of the harmful effects of its hazardous waste disposal and operating procedures.

### H. Whether The Losses At WL Were "In Progress" Before The Policies Commenced.

AH further seeks summary judgment that its Policies do not provide coverage for the losses at WL because, in many instances, the operating and waste handling practices causing the contamination occurred prior to the commencement of each policy, regardless of whether UTC knew of the losses. There are several conflicting formulations of the loss in progress doctrine. Connecticut courts have not yet analyzed the loss in progress doctrine under a property insurance policy. "When there is an absence of state authority on an issue presented to a federal court sitting in diversity... the federal court must make an estimate of what the state's highest court would rule to be its law." *Cunninghame,* 652 F.2d at 308.

In support of its position, AH cites *Vogel Paint & Wax Co. v. Travelers Ins. Co.,* No. 17448 (Iowa 1993), in which summary judgment was granted to a liability insurer because the activity causing contamination occurred before the policies took effect. However, *Vogel* is distinguishable because there was evidence that the government had notified the insured that it found contamination on its property before the insurance policy commenced. AH also relies on *Summers v. Harris,* 573 F.2d 869, 873 (5th Cir.1978), in which an insured was denied flood insurance coverage because the flood was in progress before the policy commenced. The facts in *Summers,* showed that the insured applied for flood insurance coverage on April 25th, five days after he had "parked his car on the road in front of his house and paddled a boat across the area of water which then stood in his front yard." Thus, in both cases relied on by AH, the facts clearly established that the insureds knew of some loss before the insurance policies commenced.

AH urges the Court to follow *Greene v. Cheetham,* 293 F.2d 933 (2d Cir.1961), in which an insured sought to recover under an all-risk policy for three shipments of fish

which were contaminated when they reached the warehouse. The court remanded the case for a determination of when the fish became contaminated, holding that if the fish were contaminated before the inception of the policy, the loss would not be covered, even though the insured did not know the fish were contaminated until after the policy was in effect. As discussed in Section I *infra, Greene* does not rest on the loss in progress doctrine, but rather involves a question of whether a loss occurred during the policy period.

UTC argues that the loss in progress doctrine "operates only where the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for." *Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co.*, 997 F.2d 172, 179 (6th Cir.1993).

The majority of courts analyzing the loss in progress doctrine in the context of third party liability policies have expressly found the insured's knowledge to be an essential element. *See e.g. Inland Waters supra; Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir.1981) (the loss in progress doctrine represents a fundamental principal of insurance law, that insurance does not cover a loss that is known or apparent to the insured); *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56, 63 (3rd Cir.1982); *Action Auto Stores, Inc. v. United Capitol Ins. Co.*, 845 F.Supp. 428, 433 (W.D.Mich.1993); *In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litigation*, 870 F.Supp. 1293, 1329 (E.D.Penn.1992); *City of Corvallis v. Hartford Acc. & Indemn. Co.*, 1991 WL 523876 (D.Or.1991). AH distinguishes these cases by arguing that they involve concepts applicable to a liability policy, not a property insurance policy. However, in the absence of any factual or legal authority to support its argument that this distinction should be made, the Court concludes that requiring knowledge as an element best serves the overall principle of insurance law.

Rendering a loss uninsurable once it has begun, regardless of what the contracting parties knew at the time of the contract, seems antithetical to a fair view of the insuring process whereby insureds pay money to be relieved of the risk of the unknown and the insurer determines what it will charge to accept that risk. In an all-risk policy, such as the one at issue here, the premium reflects the understanding that the risk of any damage from any non-specified event causing damage shifts from the insured to the insurer.

Furthermore, the purpose of the loss in progress doctrine, preventing fraud, will be served by a subjective knowledge analysis. The insurer is protected because the insured cannot misrepresent its knowledge to the insured. The insured is protected because the insurer cannot refuse responsibility merely by learning of facts that both parties previously were unaware of.

▬ Based on the weight of the authority and on the Connecticut Supreme Court's strong nonforfeiture of coverage language, the Court finds that Connecticut would adopt the subjective approach to the "loss in progress doctrine" in property insurance coverage disputes. *Murphy*, 206 Conn. at 417, 538 A.2d 219 ("in appropriate circumstances, a contracting party ... may be entitled to relief from the rigorous enforcement of contract provisions that would otherwise amount to a forfeiture"); *Raffel v. Travelers Indemn. Co.*, 141 Conn. 389, 392, 106 A.2d 716 (1954) ("[w]hen the words of an insurance contract are, without violence, susceptible of two interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted.").

AH argues that even if a subjective standard is used, summary judgment should be granted because UTC was aware of the effects of its business practices on the environment. For instance, in 1970 UTC repaired a tank at WL that leaked chromium contamination from 1953–1970, but took no steps to clean it up. Thus, AH argues that UTC was aware of the loss, but did not disclose it to AH. UTC disputes AH's contention that it knew of any property damage or loss at WL prior to the commencement of the Policies in 1975 because, at the time, they were not

aware of the potential for such damage. *See supra* Section G.

■ The repair of the tank alone does not demonstrate UTC's knowledge that escaped chromium had damaged the land and water. As discussed above in the Court's analysis of the fortuity requirement, summary judgment is inappropriate because there are disputed issues of material fact concerning what UTC knew about losses at WL when the policy commenced. The determination of what was known or should have been known at the time the Policies' coverage began is properly left for resolution by the finder of fact.

### I. Whether The Losses Occurred During The Policies.

The parties agree that in order to recover under an insurance policy, the loss must have occurred during the policy period. 9 Couch on Insurance 2d § 39:203 (rev. ed.1983); *see also American Home Prods. Corp. v. Liberty Mut. Ins. Co.,* 748 F.2d 760, 764 (2d Cir.1984) (finding that property damage is physical injury occurring during the policy period). UTC argues that the Court should declare by summary judgment that the loss at WL occurred throughout each of the three Policies, and that the policy in effect from 1981 to 1986 should respond for the loss at the COI.

Determining whether an insurance policy was in effect at the time of the loss necessarily involves the question of what triggers coverage. *Inland Waters,* 997 F.2d at 179. Similar to fortuity and loss in progress, the determination of what triggers coverage presents the debate between an "actual" loss versus a "known" or "manifested" loss.

AH argues that the Court cannot find as a matter of law that the losses occurred during the Policies because the losses at Windsor Locks occurred years before the Policies commenced.[23] AH contends that the Court should apply an injury-in-fact trigger, in which losses are covered under the policies only if the injury or damage began during the policy period. *Greene v. Cheetham, supra; American Home Products,* 748 F.2d at 764.

UTC argues that the Court should apply either a "manifestation trigger" or a "continuous trigger". Under the manifestation trigger, a loss is covered if it manifests or is discovered during the policy period, even if the loss causing injury began before the policy commenced. In the alternative, UTC argues that the losses occurred throughout the policy as part of an ongoing injurious process and thus under the continuous trigger, at least some of the damages at WL and all of the damages as COI occurred during the Policies.

Determining which event must occur during the policy period to trigger coverage depends on the language of the Policies. *See American Home Products, Corp.,* 748 F.2d at 764. Here, the Policies insure "against all risks of physical loss or damage to property... except as hereafter excluded."

A few decisions applying Connecticut law and interpreting whether a loss occurred under a liability policy, have applied the "injury in fact" trigger. *See Aetna Cas. & Sur. Co. v. Abbott Laboratories, Inc.,* 636 F.Supp. 546 (D.Conn.1986); *Stanton v. Northbrook Property & Cas. Ins. Co.,* 1994 WL 411260 (Conn.Super.1994). Under these decisions, an insurer is liable for all damages resulting from injuries that occurred during the policy period.

In *Maryland Cas. Co. v. W.R. Grace & Co.,* 23 F.3d 617 (2d Cir.1993), the Second Circuit, applying New York law, rejected the "continuous injury" trigger when it found that property damage from asbestos occurred only when the asbestos-containing products were installed and did not continue to occur while the products were in use. Significantly, however, the court acknowledged the possibility that "[s]ome types of property damage—such as the gradual contamination of earth and groundwater by leaking landfills—may be analogous to the slow progression of diseases such as asbestosis and cancer" and may not be amendable to the injury in fact trigger. *Id.* at 627.

The Second Circuit revisited this issue in *Stonewall Ins. Co. v. Asbestos Claims Man-*

---

**23.** AH does not appear to dispute that the losses at COI occurred during the Policies period.

*agement Corp.,* 73 F.3d at 1194. In *Stonewall,* a liability insurer agreed to indemnify the insured, a seller of asbestos-containing products, for all sums the insured was obligated to pay as a result of "an accident or a continuous or repeated exposure to conditions which resulted during the policy period in personal injury or property damages." *Id.* at 1187. Finding that the policy language required injury or damage *during the policy period,* it was necessary to pinpoint when the asbestos related bodily injury and property damage occurred.

Relying on the window left open in *Maryland Casualty,* the Second Circuit rejected the insured's argument that the "injury-in-fact" approach triggers only the policy in effect when the disease begins, finding that, in the context of progressive diseases, the injury-in-fact approach "permits triggering at various points when evidence shows injury to have occurred." *Id.* at 1195. Despite acknowledging that there could be multiple triggers of an injury in fact, the Second Circuit upheld the District Court's decision that only the insurance policy in effect when the asbestos products were installed in the building was responsible for property damage despite the insured's claimed continuous release of fibers since there was no evidence that "each release of fibers more likely than not caused property damage." *Id.* at 1210.

▮ In light of Connecticut's adoption of the injury in fact trigger, the Court believes that Connecticut would apply the multiple injury trigger in gradual environmental contamination cases. Interpreting the injury-in-fact approach as having multiple triggers reflects the reality that one contaminating event can result in several different losses after the date of its occurrence. Here, there is some indication that the damages at issue in this case continued to occur after the initial release of the contaminants through processes such as migration, leaching, alteration of the forms of the chemicals and other chemical changes while in the environment. (*See* Turk Depo. At 164, Pl.App. Exh. 35) ("I believe that at least some of the sources of contamination [at WL] have been actively impacting the soil and groundwater from the 1950's up to present date."). AH agrees that

contamination was introduced at WL since the 1950's, but rejects UTC's contention that additional physical loss or damage was caused during the term of the Policies. *See* Def.'s Reply Memorandum at 35 ("The plain truth is that nothing more happened at the WL site between the introduction of contaminants into the environment decades ago and the government orders requiring clean-up in the 1980s. Once contaminants were spilled onto the premises decades ago the damage was done.")

▮ Based on the foregoing, a genuine dispute of material fact exists whether the property losses at WL occurred or continued to occur during the Policies. UTC is not entitled to summary judgment. It appears, however, that there is no dispute that the loss occurred at COI during the policy period, and accordingly UTC's motion for summary judgment is granted as to COI on this issue.

AH argues that even if the loss occurred during the policies, UTC's claim for restitution of expenses incurred removing debris must fail. The Policies' debris removal clause provides:

> This policy insures against all risk of physical loss or damage to property described herein... and including the expense or removal of debris of such property damaged by an insured peril, except as hereinafter excluded.

The debris removal clause is triggered by the occurrence of an insured peril that is covered under the policy. AH argues that UTC has failed to show an *insured peril* damaged *covered property* during the *term* of the Policies. The Court has already ruled that contamination is an insured peril under the Policies and that soil is covered property. As discussed above, a question of fact remains regarding whether the loss at WL occurred during the term of the Policies. Accordingly, AH's motion for summary judgment is denied.

### J. *Whether The Losses At COI and the Chromium Damage at WL Were The Result of "Gradual Deterioration".*

AH argues that the chromium damage at WL and all the loss or damage at COI are

excluded from coverage under the Policies' gradual deterioration exclusion. This exclusion provides that the Policies do not insure against any damage caused or resulting from:

> [o]rdinary wear, tear, gradual deterioration, or inherent vice unless other loss or damage from a peril insured against herein ensues and then only for loss, damage or business interruption caused by the ensuing loss or damage.

According to UTC, the contamination at COI was the result of corrosion which caused holes in a sump, allowing the discharge of PCE solution and free-phase PCE into the soil beneath the sump at COI. The chromium contamination at WL, according to UTC's expert, was primarily the result of small "visually imperceptible" leaks in the chromic acid holding tank. The leaks were caused when the tank's acid-resistant liner sagged, allowing chromic acid to seep through the concrete tank.

AH argues that the contamination of COI was a direct result of the gradual deterioration of the sump and that the release of chromium at WL was a direct result of the gradual deterioration of the chromium storage tank. UTC agrees that deterioration of the chromium storage tank and the sump are excluded under the Policies, and thus UTC cannot and does not seek coverage for the damage to the tank or the sump. However, UTC contends that the escaping chromium and PCE are independent perils, separate from the gradual deterioration and, as ensuing perils, are covered under the Policies.

In support of its argument that the contamination was a direct result of the deterioration of the tank and sump, AH cites to *Acme Galvanizing Co. v. Fireman's Fund Ins. Co.*, 221 Cal.App.3d 170, 270 Cal.Rptr. 405 (1990) *review denied* Oct. 11, 1990. In *Acme Galvanizing* the rupture of a kettle resulted in the escape of molten zinc which damaged equipment. Subsequent investigation revealed that the rupture was the result of poor welding techniques and the insurer denied the claim relying on the policy exclusion for latent defects. The court rejected the insured's argument that the damaged equipment was covered as an ensuing loss

finding that the exception only "appl[ies] to the situation where there is a 'peril' i.e., a hazard or occurrence which causes a loss or injury, separate and independent but resulting from the original excluded peril, and this new peril is not an excluded one, from which loss ensues." *Id.* at 411. AH argues that the escaping chromium and PCE, like the escaping molten zinc in *Acme*, are not separate perils but the condition resulting from the first peril, the gradual deterioration of the vessels.

UTC distinguishes *Acme Galvanizing* which found no peril separate from and in addition to the molten zinc by analogy to the *Acme* court's recognition that if the molten zinc had ignited a fire or caused an explosion which destroyed the plant, then the fire or explosion would have been a new covered peril with the ensuing loss covered. *Id.* UTC maintains that similarly the contamination, a covered peril under the all-risk Policies, was a new covered peril, distinct from the excluded peril of tank deterioration.

In *Aetna Cas. & Sur. Co. v. Yates*, 344 F.2d 939 (5th Cir.1965), the insurance policy excluded direct losses caused by deterioration or rot, but the exclusion would not have applied to an ensuing loss caused by water damage. The plaintiffs in *Yates* discovered that inadequate ventilation in their basement had prevented moisture from escaping causing the subflooring in their home to rot. The court found the damage was excluded under the policies, but in dicta, suggested that the insured would have been covered if its water damage was the result of a rusty pipe that burst or the collapse of a rotted wall, although the rusty pipe or rotted wall itself would not be covered. *Id.* at 941. Similarly, UTC argues that contamination of the soil is covered because it resulted from the deterioration of the sump and tank, notwithstanding the noncoverage for the sump and tank themselves.

■ The Court concludes that the environmental contamination resulting from the deterioration damage to the sump may be deemed a separate, independent and thus covered peril under the Policies.

Alternatively, AH's motion for summary judgment will be denied because UTC has demonstrated the existence of genuine disputes of material fact regarding the cause of the contamination, disputing that the contamination at COI was the result of ordinary wear and tear. (Manousiouthakis Expert Report, Pl. Resp.App. Exh. 96). Instead, UTC contends that the sump deteriorated as a result of a design defect in the degreaser. As UTC's expert explained, the degreaser "should have been and could have been designed and constructed in a manner which would not allow PCE to reach the sump." *Id.* Further, UTC disputes that the contamination was the result of *gradual* deterioration. UTC argues that they inspected the tank annually, and the inspection in 1969 showed no leakage, but the inspection in 1970 revealed leakage. (Dewling Rep., Pl. Resp. Exh. 145.) In light of the foregoing, summary judgment is inappropriate.

### K. *Whether AH's Claims Handling Practices Violated CUIPA*

UTC argues that it is entitled to judgment that AH's claims handling practices violated the Connecticut Unfair Insurance Practices Act ("CUIPA"), in that AH is claimed to have the practice of turning over certain types of claims to one particular lawfirm to litigate without first even assigning an adjuster to settle or adjust the claims.[24] In order to establish a CUIPA violation under Conn. Gen.Stat. § 38a–816(6), UTC must demonstrate that AH's deceptive claims handling practices were committed or performed with such frequency as to indicate a general business practice. *Mead v. Burns,* 199 Conn. 651, 655, 509 A.2d 11, 14 (1986).

An insured cannot establish a general business practice by alleging only unfair acts associated with the insured's claims under a single insurance policy. *Lees v. Middlesex Ins. Co.,* 229 Conn. 842, 849, 643 A.2d 1282 (1994) ("defendant's alleged improper conduct in the handling of a single insurance

claim, without any evidence of misconduct by the defendant in the processing of any other claim, does not rise to the level of a 'general business practice.'")

In reaching its decision in *Lees,* the Connecticut Supreme Court cited with approval a District Court decision dismissing an insured's CUIPA claim against its insurer because the several deceptive acts the insured alleged were all based on the insurer's denial of plaintiff's claim for insurance coverage. *Aguilar v. United Nat'l Ins. Co.,* 825 F.Supp. 456 (D.Conn.1993) (Dorsey, J.). "These actions are in reality one act on the part of the insurer. There is only one insured and one insurance policy involved. To hold that such allegations rise to a level of a general business practice would be to render *Mead* meaningless, as an insured who is denied coverage could circumvent *Mead* by classifying a single denial in several different categories of unfair settlement practices." *Id. See also Quimby v. Kimberly Clark Corp.,* 28 Conn.App. 660, 613 A.2d 838 (1992) (dismissing plaintiff's claim alleging multiple unfair claim practices for failure to state a claim because insured failed to allege unfair claims handling practices by the insurer for other claims).

Here, UTC alleges that AH violated CUIPA when handling the environmental claims UTC submitted for more than forty locations around the United States. However, the claims for all of the locations implicate only AH's claims handling practices under these three Policies. Other than a discussion of index cards received during discovery which describe pollution or contamination claims filed by 42 other policyholders, UTC has failed to demonstrate a general business practice. The index cards are insufficient to satisfy UTC's initial burden of showing entitlement to judgment as a matter of law because they merely show that the law firm of Mound, Cotton, & Wollan was regularly assigned to the claims and that an adjuster was

---

**24.** UTC alleges the following violations of § 38a–816(6):

 (a) misrepresentation of facts pertinent to coverage;

 (c) failure to adopt and implement reasonable standards for a prompt investigation;

 (d) refusal to pay claims without conducting a reasonable investigation; and

 (n)failure to provide a reasonable explanation of the basis for denial of the claims.

not appointed. UTC has not presented any authority for the proposition that an insurance company need hire an adjuster for its claims or that the hiring of a law firm to assist in its claims handling is improper. In light of the foregoing, UTC's motion for summary judgment is denied.

## L. Whether AH's Claims Handling Practices Constitute Bad Faith.

UTC argues that there is no dispute of material fact that AH breached the implied duty of good faith and fair dealing. Specifically, UTC contends that AH (a) misrepresented facts pertinent to coverage; (b) failed to adopt reasonable standards for a prompt investigation; (c) refused to pay claims without conducting an investigation; and (d) failed to give a reasonable explanation for its denial of plaintiff's claims.

██ UTC claims that these practices demonstrate that AH violated Connecticut's common law obligation of good faith and fair dealing. The mere failure to pay a claim is not sufficient to establish bad faith *Buckman v. People Express, Inc.*, 205 Conn. 166, 171, 530 A.2d 596, 599 (1987). The plaintiff must show that the defendant had "a design to mislead or deceive" or neglected or refused "to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties." *Id.* UTC claims AH's practices as a matter of law constitute bad faith under this definition.

### 1. Misrepresentation of Facts Relating to Coverage

UTC contends that AH repeatedly represented that a fact-specific investigation was necessary to evaluate UTC's claims. Based upon these representations, over the course of several years, UTC prepared and submitted 14 proofs of loss with respect to eight of the facilities and voluminous other documents and supporting materials. AH never communicated any definitive coverage position to UTC, but now asserts defenses to coverage that UTC argues should have been apparent soon after UTC's claims were made and did not require extensive discovery. For instance, AH now claims that the Policies do not cover "real property". UTC argues that

AH misrepresented that it intended to investigate its claims when, in actuality, it intended merely to delay making a coverage decision, causing UTC to incur substantial costs and to discourage UTC from pursuing coverage.

As discussed more fully below, AH disputes that it did not promptly investigate UTC's claim. AH contends it was attempting to investigate UTC's claim, as it investigates all claims, but that UTC's failure to cooperate hindered AH's ability to make a coverage determination.

### 2. Refusal to Adopt Standards For a Prompt Investigation

UTC claims AH does not have reasonable standards to conduct a prompt investigation and that AH only evaluates environmental claims to prepare them for litigation, not for the purpose of making a coverage decision.

In support of its argument, UTC claims that AH regularly referred all property insurance claims to the law firm of Mound, Cotton & Wollan ("Mound, Cotton") solely to prepare for litigation. As evidence of such a practice, UTC refers to an AH internal memorandum explaining that all property insurance environmental claims are handled by Mound, Cotton. (Pl.Exh.App.54.) UTC argues that this practice discouraged claims and was not a reasonable procedure for handling claims. In addition, UTC argues that AH's assertion of the "work product" privilege for all documents within its possession proves that they took claims with the purpose of preparing for litigation.

AH contends that Mound, Cotton's role was to develop a coverage analysis, not to prepare for litigation. Moreover, AH argues that its claims handlers were involved in UTC's claim and closely monitored Mound, Cotton's progress. AH contends that all property insurance environmental claims are referred to counsel because "they were unique, not the normal course of claims I had received and involved coverage issues, we wanted those coverage issues looked at prior to making a decision as to whether we would go forward with the adjustment or not." (Owens Depo. at 70–71, Pl. Exh. 33.) (*See*

# 157

*also* Milone Depo., Pl. Exh. 30 at 39–40) (testifying that AH did not have a policy to turnover all environmental claims to counsel).

### 3. Refusal to Pay Claims Without Conducting An Investigation

UTC claims AH refused to reimburse UTC for its environmental claims without conducting any investigation into the validity of UTC's claims. AH argues that it has been trying to conduct an investigation of the claims, but has been hindered by UTC's inadequate responses to questions regarding the losses. The Policies require UTC to report losses with "full particulars". AH contends that the notice it received was inadequate. The notice of the COI site was a two paragraph letter without any information about the loss. AH received notice of the WL claim when it was served with the complaint in the Massachusetts action against all UTC's insurers.

The Massachusetts's court dismissed the action against all property insurers on the basis that UTC failed to fulfill the Policies' notice provision. AH alleges that even after the action was dismissed, UTC still did not comply with the notice provision. Instead of submitting notice as required by the Policies, UTC submitted partial proofs of loss with respect to 8 of the 40 sites. AH alleges that these proofs were wholly insufficient because they did not detail any events that led to the contamination. Instead, they recited UTC's history of infraction of government regulations.

In response to each proof of loss received, AH contends that it advised UTC of the issues AH perceived in connection with each proof and requested further information to assist their investigation. UTC failed to present the Court with any evidence that AH's requests for information were improper or sought irrelevant information.

AH contends that UTC's counsel acknowledged that COI should be the first claim addressed by AH. Thus, AH argues it was UTC's counsel who set the course by which the claims review process was carried out. In a letter dated April 27, 1989, AH requested to have adjusters travel to COI to interview personnel. UTC responded on June 5,

1989, by requesting AH to identify in writing the specific areas of inquiry and specific information requests relative to the matters covered by the partial proofs of loss before they send anyone to COI. On August 18, 1989, AH gave UTC the requested letter outlining the areas of inquiry and information requested. AH alleges UTC failed to respond to its letter in "any meaningful way" until January 16, 1990, at which time UTC agreed to make available some 6,447 pages of documents for COI only. UTC failed to identify any personnel that AH could meet. In sum, AH contends that any inadequacy in its investigation was the result of UTC's failure to cooperate, not AH's bad faith.

### 4. Failure to Communicate Or Explain AH's Coverage Position

UTC alleges that AH failed to communicate a coverage position to UTC within a reasonable time, and, once this suit began UTC learned, via defenses asserted, that AH was denying coverage for all claims. Further, UTC claims it did not learn of the basis for AH's denial until it began this action.

AH claims that in April 1992, when UTC filed this suit, there were outstanding requests for information to which UTC had not responded. AH claims it had not yet resolved the coverage issues and therefore did not communicate a decision concerning coverage.

In support of its position, AH cites *McCauley Enterprises v. New Hampshire Ins. Co.*, 716 F.Supp. 718 (D.Conn.1989) (Dorsey, J .) ("The failure to deny coverage is not unreasonable when the defense is conducting further investigation as to the cause of loss. When a good faith legal controversy exists, the insurer's withholding of the policy proceeds is not in bad faith even if the insurer's position is ultimately erroneous."). Similarly, AH claims that it did not have a duty to decline coverage until it received an adequate amount of information about the losses.

 As is evident from the above discussion, there are genuine issues of material fact in dispute regarding each of UTC's claims. AH argues that it did not make any misrepresentation regarding the need to conduct an

investigation. Further, AH argues that UTC's counsel dictated the investigative process, thus any delays in the investigation are the result of UTC's conduct. AH claims it responded promptly to the partial proofs submitted by UTC, kept UTC fully informed of coverage issues and requested and reviewed voluminous information obtained from UTC and outside governmental agencies. AH contends it began investigating promptly, but was delayed because UTC did not make a meaningful production until late 1991, three years after documents were requested. In light of these disputes of fact, UTC's motion for summary judgment is denied.

### M. *Whether UTC Complied With The Policies' Service of Suit Provision.*

AH claims UTC's action is barred by the suit limitation provision of the policy. The Policies provide that

> No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Assured shall have fully complied with all of the requirements of this policy. The Company agrees that any action or proceeding against it for recovery of any claim under this policy shall not be barred if commenced within the time prescribed therefore in the statutes of the State of New York.

Policies at ¶ 28.

AH argues that this reference to the "statutes of the State of New York" is intended to refer to the two year limit used in New York's Standard Fire Insurance Policy pursuant to N.Y. Ins. Law. § 3404 (McKinney 1985). AH maintains that the language in the Policies is similar to that of the corresponding provision in § 3404, but that rather than set a specific time limit in the Policies, it instead refers to the Statutes of New York because the legislature occasionally changes the time period and AH wanted the Policies to reflect such a change.

New York Insurance Law § 3404 was amended effective September 1, 1975, two months before the issuance of the first AH policy, to provide a twenty four month statute of limitations, changed from 12 months. AH notes that the suit limitation provision contained in the form policy jacket, which was substituted by this reference to New York law, required the suit to begin within twelve months, thus it mirrors the pre-amendment statutory time and, according to AH, demonstrates its intent to refer to § 3404.

AH fails to explain, however, why the reference is to the statutes of the State of New York, rather than § 3404 of the New York statutes. Further, AH has failed to provide the Court with any authority for the proposition that a reference to New York law in an all risk policy can reasonably be interpreted to refer to the New York standard fire insurance suit limitation period.

UTC argues that ¶ 28 does not establish a statute of limitations period, but rather establishes a time period in which UTC may bring an action without expressly prohibiting suits commenced after that time. Paragraph 28 provides that the insured's action "shall not be barred if commenced within the time prescribed" which stands in contrast to other property insurance policies provisions that state "[n]o action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss." Cozen, *supra*, at § 50.05.

The Policies do not contain a clear and unequivocal statute of limitations provision. The reference to the statutes of New York on its face appears to refer to the six year statute of limitation for all contracts found in N.Y. Civ. Prac. L. & R. § 213(2) (McKinney 1994), which is the same limitations period as that provided under Connecticut law. Conn. Gen.Stat. Ann. § 52–576(a) (1996).

Under New York law, the statute of limitation for a breach of contract action commences running at the time the breach occurred. *Medical Facilities, Inc. v. Pryke,* 463 N.Y.S.2d 804, 95 A.D.2d 692 (1983), *aff'd* 62 N.Y.2d 716, 476 N.Y.S.2d 532, 465 N.E.2d 39 (1984). AH claims that UTC did not satisfy the six year statute of limitations because UTC commenced its action in December 1987 and UTC was aware of environmental loss at WL by 1980 at the latest. As discussed in detail above, there is a genuine

issue of fact regarding when UTC was aware of the loss at WL, thus the determination of when the statute of limitations began to run is properly left for the finder of fact. Accordingly, AH's motion for summary judgment is denied.

## VI. CONCLUSION

For the foregoing reasons UTC's Partial Summary Judgment Motion is GRANTED in part and DENIED in part. AH's Motion for Summary Judgment is GRANTED in part and DENIED in part.

IT IS SO ORDERED.